In re Gertrude LOHR,
Chapter 7 Debtor.

Gertrude Lohr, Plaintiff,

v.

Sallie Mae, and Sherman B. Lubman,
Trustee, Defendants.

Bankruptcy No. 99–30936–T.
Adversary No. 99–3062–T.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

April 3, 2000.

Robert L. Flax, Richmond, VA, for Plaintiff/Debtor.

Rand L. Gelber, Vienna, VA, for Defendants.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

The plaintiff debtor, Gertrude Lohr, filed this adversary proceeding against defendants Sallie Mae and Sherman B. Lubman, Chapter 7 Trustee, seeking to discharge her student loans. Education Credit Management Corporation (ECMC) was substituted as a defendant in place of Sallie Mae due to transfer of interest in the underlying loans. Defendant Sherman B. Lubman, Chapter 7 Trustee, was dismissed as a defendant because there were no assets in the estate. At trial held February 23, 2000, to determine dischargeability of these debts, the court took the matter under advisement. For reasons stated in this opinion, the court will grant a partial discharge of the student loans as an undue hardship under 11 U.S.C. § 523(a)(8).

### Findings of Fact

The debtor is approximately 57 years old (born April 23, 1943), divorced and has no dependents. She entered school at a time when she was homeless, ill, and thought going back to school would give her a chance to get back on her feet and give her much needed shelter. The debtor attended Hood College and received a Bachelor of Arts degree in Religion and Psychology in 1984. Thereafter, the debtor attended Wesley Seminary and received a Masters Degree in 1988. She continued her education by seeking a doctoral degree from Garrett Seminary in 1991. Ultimate-

ly, the debtor had to leave school because she was unable to obtain additional student loans.

The debtor has been employed at Rubicon, Inc., since August 29, 1994, where she earns approximately $30,000.00 per year as a Certified Substance Abuse Counselor. The debtor suffers from chronic physical and mental health problems which affects her work performance and consumes all her resources.

On February 10, 1999, the debtor filed for chapter 7 relief. On May 7, 1999, the debtor filed this adversary proceeding to discharge approximately $35,000.00 on seven different student loans guaranteed by Sallie Mae, and a companion adversary proceeding (99–3061–T) to discharge a $2,500.00 loan with Hood College that is serviced by Edusew Tech. Debtor asserts that repaying these loans would constitute undue hardship as that term is used in § 523(a)(8).

Additional findings of fact are stated in the section on the court's conclusions of law.

### Conclusions of Law

The issue presented is whether debtor's student loan is excepted from discharge as an undue hardship.

Bankruptcy Code § 523 provides in the relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a government unit, or made under any program funded in whole or in part by a government unit of nonprofit institution, or for an obligation to repay funds received as an education benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue

hardship on the debtor and the debtor's dependents;

11 U.S.C. § 523.

### UNDUE HARDSHIP.

Congress did not define "undue hardship" in the Bankruptcy Code. The phrase was lifted verbatim from the draft bill proposed by the Commission on the Bankruptcy Law of the United States. *See Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 754 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2d Cir.1987). The Commission's report provides some inkling of its intent in creating the exception, intent which in the absence of any contrary indication courts have imputed to Congress. *See id.* The Commission envisioned the determination of undue hardship as a calculation encompassing whether the amount and reliability of income and other wealth which the debtor could reasonably be expected to receive in the future could maintain the debtor and his or her dependents at a minimal standard of living as well as pay off the student loans. *See id.* (discussing *Report of the Commission on the Bankruptcy Laws of the United States*, House Doc. No. 93–137, Pt. 1, 93d Cong., 1st Sess. 140 n. 16 (1973)). Courts have interpreted undue hardship to be very stark. *See, e.g., Wilson v. Missouri Higher Educ. Loan Auth. (In re Wilson)*, 177 B.R. 246, 248 (stating dischargeability of student loans should be based upon a "certainty of hopelessness"); *In re Kohn*, 5 Bankr.Ct. Dec. (CCR) 419, 20 C.B.C. 994 (Bankr.S.D.N.Y.1979) (stating Congress meant the discharge of student loans to be an available remedy to those severely disadvantaged economically as a result of factors not within the control of the debtor which are so much a part of the debtor's life, present and in the foreseeable future, that the expectation of payment is virtually non-existent unless the bankrupt is stripped of all that makes life worth living).

Courts within the Fourth Circuit have not adopted a definitive test to determine

whether repayment of a student loan will impose an undue hardship. *See Kapinos v. Graduate Loan Ctr., Pennsylvania Higher Educ. Assistance Agency (In re Kapinos)*, 243 B.R. 271, 275 (W.D.Va. 2000). Lower courts within the Fourth Circuit that have examined the issue of undue hardship have used a variety of tests. Some courts have adopted a three part test which was set out by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Servs., Corp.*, 831 F.2d 395, 396 (2d Cir.1987).[1] *See, e.g., In re Kapinos*, 189 B.R. 274 (W.D.Va.1995); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905 (D.S.C.1995), *aff'd*, 85 F.3d 615 (4th Cir. 1996); *Walcott v. USA Funds, Inc. (In re Walcott)*, 185 B.R. 721, 724 (Bankr. E.D.N.C.1995). Other courts have taken into account a group of relevant factors, *see, e.g., In re Wilson*,[2] 177 B.R. at 248, or have employed a case-by-case analysis focusing on the existence of extraordinary or unique circumstances, *see Ballard v. Commonwealth of Virginia, ex rel. State Educ. Assistance Auth. (In re Ballard)*, 60 B.R. 673, 674 (Bankr.W.D.Va.1986).

■ Regardless of the test used, court decisions determining whether repayment of student loans constitute undue hardship under § 523(a)(8) focus on two issues: (1) the economic prospects of the debtor, and (2) whether the conduct of the debtor disqualifies the debtor from taking advantage of the exception. *See* Andrew M. Campbell, Annotation, BANKRUPTCY DISCHARGE OF STUDENT LOAN ON GROUND OF UNDUE HARDSHIP UNDER § 523(A)(8)(B) OF BANKRUPTCY CODE OF 1978 (11 U.S.C.A. § 523(A)(8)(B)) DISCHARGE OF STUDENT LOANS, 144 A.L.R. FED. 1, 31 (1998).

### 1. Economic Prospects of the Debtor.

■ With regards to the current and future economic prospects of the debtor, courts have considered (a) whether or not the debtor has dependents, (b) the income level of debtor, (c) the health of debtor and dependents (if any), and in the case of debtors with dependents and low income, (d) the education level of debtor. *See id.*

a. Dependents—The debtor does not have any dependents who financially rely on her. Conversely, she has no one who will financially help her. She is divorced. Her mother, who is 90, is unable to help her, and other family members will not help her.

b. Income Level—The debtor has been employed at Rubicon, Inc., since August 29, 1994. The debtor's gross wage is ap-

---

1. The Brunner test requires a three part showing:
   (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.
   *Brunner*, 831 F.2d at 396. It appears that the national trend is toward adoption of the Brunner standard. *See Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905 (D.S.C.1995), *aff'd*, 85 F.3d 615 (4th Cir.1996) (noting courts in the Second, Sixth, Seventh, Eighth and Eleventh Circuits have adopted the Brunner standard). The Fourth Circuit Court of Appeals has recently used this test on a Virginia case in an unpublished opinion.

   *See Kasey v. Pennsylvania Higher Educ. Assistance Agency (In re Kasey)*, 187 F.3d 630, 1999 WL 507274 (4th Cir.1999) (unpublished opinion).

2. Relevant considerations discussed in *In re Wilson* include:
   (a) employment status; (b) other sources of wealth; (c) current income required to maintain a minimal living standard; (d) whether the debtor's education and skills are being used to their best advantage; (e) the health of the debtor and any dependents; (f) living expenses; (g) future financial resources; (h) good faith of the debtor; and (i) whether the bankruptcy was filed merely to avoid the student loan obligation. *In re Wilson*, 177 B.R. at 248 (citing *Armijo v. New Mexico Student Loan Program (In re Armijo)*, 13 B.R. 175, 177–78 (Bankr.D.C.N.M. 1981)).

proximately $30,000.00 per year. Continued employment is subject to state funding of the program. There is no indication of any other sources of income or wealth.

c. Health—The debtor's health problems are in some ways a defining aspect of this case. She describes a childhood marked by persistent physical and emotional abuse and neglect, which contributed to choices in early adulthood that led to further abuse. The debtor has suffered from ulcerative colitis since her teenage years and has had severe problems with this condition since 1983. She has had a number of surgeries, including major surgery to remove her large intestinal system in 1988. Unfortunately, even this was not a cure, and she has suffered repeated blockages, nutritional deficiencies, adhesions and has required multiple hospitalizations. This appears to be a chronic condition where she is subject to relapses because of the nature of her surgeries and her condition. The debtor sees a number of health care professionals.[3] She requires a special diet and has very specific nutritional needs. Due to the aforementioned, the debtor has sought and continues to receive psychiatric care for post-traumatic stress and severe depression. Historically she has spent enormous amounts of money on medical bills, missed time from work, and has required therapy and expensive medications. There is no indication that her health problems will improve markedly in the foreseeable future.

## 2. Good Faith Conduct of the Debtor.

■ With regard to the debtor's conduct, courts have considered the debtor's good faith efforts to pay off the student loans by (a) maximizing the debtor's income, (b) minimizing the debtor's expenses, (c) attempting to make payments upon the loans or negotiate deferrals of loan payments in lieu of bankruptcy. *See id.* at 34. In addition, courts have considered whether the discharge of the debtor's student loans would be consistent with the policy of Congress in restricting the discharge of student loans by considering whether the dominant purpose of the debtor in filing bankruptcy was to discharge the student loans. *See id.*

■ a. Good faith attempts to maximize income require the debtor to take advantage of opportunities for work when it has been available and diligently look for work, whether or not in the debtor's chosen field, when it has not been available. The debtor has asked for raises with her present employer but has been refused. She is in the process of qualifying to be a Licensed Clinical Social Worker (LCSW). This will take at least two years as she needs additional courses and licensed supervision. Receipt of the LCSW will enhance her chances of keeping her job and qualifying for a better one.[4] For the past several years the debtor has applied for better paying employment about twice a month without any success. She has even contacted family and friends to see if they know someone that might want to rent a room in her house, but based on her prior experiences and psychiatric condition is reluctant to advertise.

■ b. Good faith attempts to minimize expenses require that the debtor economize and avoid excessive or lavish expenditures. The debtor does not own anything that is not protected by her homestead exemption. Her home is assessed well below average, fully encumbered and has mortgage payments comparable to month-

---

3. The debtor sees her primary physician every 3 or 6 months, a nutritionist 3 or 4 times a year, a psychiatrist every 3 months, and a social worker (who is in close contact with her doctors) weekly.

4. The debtor's current employer expects her to keep moving forward in her education and wants her to get certified as a LCSW. Many of the jobs that the debtor is applying for require this certification. Financially, having this certification would be a lateral move, but would allow her to obtain a job at a company that has possibilities for advancement.

ly rent at an apartment building. Her car is twelve years old. Food costs are high, but this is because of her restrictive diet. The debtor has tried to minimize her psychiatric care costs by using a social worker who works closely with her psychiatrist. There is no place in her budget for luxuries such as vacations, cable television or other forms of entertainment. She has been a member of Debtors Anonymous since November 1997, where she is continually working on a budget.

 c. Good faith attempts to repay loans require the debtor to have made payments when he or she was in a position to make such payments. While in school the debtor received deferments and after graduation received forbearances when she was ill. She has written to Sallie Mae about her financial difficulties, but it declined any further forbearances. From November 1997 until September 1998, she paid $50.00 per month to Sallie Mae and $5.00 per month to Edusew. In total, the debtor has only made $550.00 in student loan payments to Sallie Mae since the inception of her loans. The debtor discontinued loan payments in 1998 when she was hospitalized, and she asserts that she is unable to resume payments. The debtor filed bankruptcy a few months later, based in part, upon the recommendation of her therapist.

 Finally, Congressional intent in enacting restrictions on the discharge of student loans was to prevent debtors from using student loans to obtain a higher education and then declaring bankruptcy to discharge the loans. *See id.* at 35. Courts have usually refused to discharge student loans when they are the bulk of the debtor's debt or when student debt is the first or second largest single type of debt. *See id.* However, in a number of cases courts have found that the policy

behind the restrictions on the discharge of student loan debt was not violated even though the student loan was the largest item of the debtor's debt, when several years had elapsed between the date the loan payments became due and the filing of bankruptcy, and the debtor had made payments on the loan or the debtor's financial affairs were generally distressed. *See id.*

In this case, more than two-thirds of the unsecured debt is related to education.[5] The dominant purpose in filing bankruptcy was clearly to discharge the student loans. However, several years have elapsed between the date the loan payments became due and the filing of the bankruptcy petition. Moreover, the debtor made payments when she was financially able, tried to negotiate deferments and forbearances in lieu of declaring bankruptcy when she was not and filed bankruptcy only as a last resort upon the urging of her therapist. The court finds that there is a certainty of hopelessness that the debtor will never be able to pay the full amount of her student loans. The possibility of the debtor repaying the full amount of her student loans is virtually non-existent unless the bankrupt is stripped of all that makes life worth living.

**PARTIAL DISCHARGE.**

 The Fourth Circuit has not yet addressed the issue of whether student loans may be partially discharged. While the language of § 523(a)(8) does not explicitly authorize partial discharge, the wide majority of courts that have considered the question have concluded that the section does permit a partial discharge. *See In re Kapinos,* 243 B.R. at 275. In addition, a majority of courts have held that bankruptcy courts are empowered to partially discharge a student loan under § 105,[6]

5. Total liabilities on the debtor's bankruptcy schedules are broken down as follows: $67,084.00 due on mortgage loans secured by her home; $35,348.58 due on student loans ($33,112.50 due Sallie Mae and $2,236.08 due Edusew Tech); and $16,082.58 due on unsecured nonpriority claims (including $5,500.00 due Garrett Theological Seminary).

6. Section 105(a) provides:

even if the standard under § 523(a)(8) is not met. *See id.* at 276, 277. Thus, the court can, at its discretion, excuse any portion of the debtor's student loan obligations which would create an undue hardship and can recommend a payment plan which will lead to the reduced obligation being paid in full. *See Jones v. Nat'l Payment Ctr., Signet Bank Student Loan Dep't (In re Jones)*, 242 B.R. 321, 326–27 (Bankr.E.D.Va.1998).

A survey of the facts behind the case law regarding § 523(a)(8) reveals many heart rendering stories. This case is no exception. Based on the evidence presented to the court at trial, the court's analysis of the debtor's budget in the Appendix and a review of applicable case law, the court holds that $4,500.00 principal of the approximately $35,000.00 on the loans guaranteed by Sallie Mae (which assigned its interest to ECMC) is non-dischargeable, and all remaining outstanding balances on her student loans, including principal, interest, fees, collection costs, and penalties are dischargeable. The court recommends repayment of $4,500.00 principal at 7% interest amortized over ten years. While this may impose a hardship, it is not undue.

An order consistent with this opinion will be entered.

## APPENDIX
### Getrude Lohr
### Schedule of Monthly Income and Expenses

|  | Unadjusted per exhibits | As adjusted by the court |
|---|---|---|
| **INCOME** | | |
| Gross Wages | $ 1,799 | $ 2,500 |
| Less deductions | 253 | 300 |
| Net Wages | $ 1,546 | $ 2,200 |
| | | |
| **EXPENSE** | | |
| Mortgage | $ 627 | $ 627 |
| Utilities | 210 | 210 |
| Home maintenance | 100 | 100 |
| Food and nutritional supplements | 520 | 520 |
| Medical and dental | 220 | 220 |
| Transportation | 100 | 100 |
| Insurance: | | |
| Life | 68 | 0 |
| Health | 68 | 68 |
| Automobile | 65 | 65 |
| Taxes on personal property | 100 | 5 |
| Clothing and laundry | 30 | 30 |
| Unreimbursed employee expenses | 200 | 100 |
| Contingencies | 142 | 100 |
| Total Expenses | $ 2,450 | $ 2,145 |
| | | |
| **NET AVAILABLE FOR STUDENT LOANS** | $ (904) | $ 55 |

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a).