**In re Duane L. BURTON, Debtor.**

**Duane L. Burton, Plaintiff,**

v.

**Educational Credit Management Corp., Continental Service Group, Inc., Defendants.**

**Bankruptcy No. 04–53297–SCS.**
**Adversary No. 05–5016–SCS.**

United States Bankruptcy Court,
E.D. Virginia,
Newport News Division.

Jan. 11, 2006.

Lorin D. Hay, Virginia Beach, VA, for Debtor.

Rand L. Gelber, Rockville, MD, for Defendant.

## MEMORANDUM OPINION

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came on for trial on November 1, 2005, upon the Complaint by Debtor to Determine Dischargeability of Educational Loans under § 523(a)(8) of the Bankruptcy Code. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and the pleadings submitted, the Court makes the following findings of fact and conclusions of law.

### I.

### PARTIES AND PROCEDURAL HISTORY

Duane L. Burton ("Burton") filed under Chapter 7 of the Bankruptcy Code on December 15, 2004. Burton filed an adversary complaint on March 30, 2005 (the "Complaint") to determine the dischargeability of educational loans owed to Educational Credit Management Corporation and Continental Service Group, Inc. (collectively "ECMC"). Burton's Complaint alleges that he owes $96,156.29 and $16,501.58 plus interest on two separate educational loans, and that these debts should be discharged "on the grounds that excepting such debt from discharge would impose an undue hardship on the debtor and the dependents of the debtor." Pl. Compl., at 1. ECMC filed an Answer to Complaint on April 22, 2005 (the "Answer") admitting that Burton was indebted to them, but denying that the amounts alleged by Burton were the correct amounts of the claims. ECMC requests that the Court "[d]eclare the indebtedness evidenced by the Note(s) as a non-dischargeable obligation pursuant to 11 U.S.C. § 523(a)(8)." Def. Answer, at 2. Prior to trial, the parties stipulated that the Plaintiff's Chapter 7 Voluntary Petition and Schedules and the Defendant's Exhibits A–H should be admitted into evidence.[1]

---

1. Counsel for ECMC presented eight exhibits, which are labeled A–H. Defendant's Exhibit A is an Application/Promissory Note dated December 2, 1987. Defendant's Exhibit B is a loan history and loan balance as of April 18, 2005. Defendant's Exhibit C is an as-

The parties also stipulated that Duane Burton would be the only witness called to testify.

## II.

## FINDINGS OF FACT

### A. Educational Loans

Burton, who is currently 44 years old, took out various educational loans in the 1980's to finance his college education at the University of Rochester and the State University of New York. He attended school from 1982 to 1989, and attempted to gain a Bachelor of Science degree in Sociology.[2] Burton's Schedules in his bankruptcy filing reflect that he owes more than $130,000.00 in educational loans. His Schedule F lists a debt to ECMC in the

amount of $96,000.00; a debt to New York Higher Education Services in the amount of $12,087.00; and a debt to Sallie Mae Consolidation in the amount of $22,296.00, as well various Student Loan Service Center fees.[3] Burton testified that he made a couple of payments on his educational loans in the late 1980's and early 1990's; however, his testimony makes it clear that his payment history is very limited.[4] Further, he testified that he contacted Sallie Mae in the late 1980's or early 1990's about a loan consolidation, and that payments for his student loans have been made through tax intercepts. Burton also testified that he has a history of medical problems that have impacted his ability to stay continuously employed and therefore make his student loan payments.

signment letter dated May 28, 2003 from New York State Higher Educational Services Corporation to ECMC. Defendant's Exhibit D is ECMC's First Set of Interrogatories ("Defendant's Interrogatories") and First Request for Production of Documents to Plaintiff. Defendant's Exhibit E is Plaintiff's Responses to Defendant's Interrogatories. Defendant's Exhibit F is Plaintiff's responses to ECMC's Request for Production of Documents. Defendant's Exhibit G is a letter to Plaintiff's counsel describing loan repayment options. Finally, Defendant's Exhibit H was reserved for any exhibits listed or identified by Plaintiff.

2. Burton testified that while he has enough or almost enough credits to get a degree, he was unable to actually receive his degree because he left school because of his illness. Additionally, he testified that in order to get his degree, he would have to re-enroll in a college or university, but that he does not have the money to do so. Despite this testimony, Burton in his response to Defendant's Interrogatory Number 15 which asked Burton to state the "[n]ature of any degree received or will receive from such a school," stated "Bachelor of Science in Sociology." Def. Exh. E., Interrogatory No. 15.

3. Counsel for ECMC argued that Burton actually owes over $150,000.00 in student loans,

and in reaching that conclusion listed the fees owed to ECMC, New York State, and Sallie Mae, as well as approximately $44,000.00 to Rubin and Rothman. Burton's Schedule F does reflect a debt to Rubin and Rothman, LLC, in the amount of $44,217.00; however, the debt is listed as "1991 collections," and it is impossible for the Court to determine from the notation whether the amount is for educational loans. Burton testified that he owes around $100,000.00 for his student loans. Given the conflicting testimony, and how the testimony conflicts with Burton's Schedules, this Court will assume that Burton's loans total somewhere between $100,000.00 and $150,000.00.

4. Counsel for ECMC argued that Burton has never made any attempt to pay on his student loans and in support of this argument referred the Court to the Defendant's Interrogatories. In the Interrogatories, Burton was asked "[s]tate any attempts ... made to repay the student loans which were guaranteed by ECMC or which are presently held by ECMC," and his answer states, "[i]ncome tax intercepts (1991–present)." Def. Exh. E, Interrogatory No. 16. However, Burton testified at trial that he did make some voluntary loan payments in the late 1980's and early 1990's. Burton, while arguing he made some voluntary payments, admitted at trial that he has not made a voluntary payment since approximately 1992.

## B. Educational and Employment History[5]

Burton testified that while in high school he enlisted in the Marines through a delayed entry program. Burton testified that he served in the Marines from 1977 through 1981 and during that time worked as an aircraft recovery technician. Burton further testified that he received a non-service medical discharge from the Marines after he started having stress-related problems that occurred after learning his oldest brother had been killed.[6] After leaving the Marines, Burton moved in with his parents, and after a few months he began working at a steel mill. Burton did not testify as to how long he worked at the steel mill, but he did testify that after working at the steel mill, he took another job working as a housekeeper.

In 1982, Burton enrolled in the University of Rochester ("Rochester"), and he tes-

tified that he stayed at Rochester for five years. Burton further testified that he left Rochester in 1987 because he was having problems coping and he had started drinking. However, Burton also testified that he was hospitalized for approximately 30 days in 1988 while at Rochester, because he had a nervous breakdown. The Court is unsure how to reconcile this testimony given the conflicting testimony regarding dates.[7]

After leaving the University of Rochester, Burton testified that he attended the University of Buffalo ("Buffalo"). While he was at Buffalo, Burton testified that he went to a Veterans Affairs Hospital[8] that was near where he was living at the time, and it was there that he began to learn about his illness. Additionally, Burton testified that he has had problems with cocaine which began around his junior or senior year in college.[9]

5. Much of what the Court knows about Burton's history between 1977 and the early 1990's comes from the Court's questioning of Burton at trial. After counsel was given the opportunity to examine Burton, the Court further questioned Burton about his educational history and medical history, regarding the time period prior to Burton's relocation to Hampton Roads. Tr. at 43–52.

6. Burton testified that when he learned his brother had been killed that he started questioning his life and that his mom felt his writings were "kind of strange." In fact, he testified that his mom even wrote his Congressman about him. While, Burton's testimony was not clear as to why his mother wrote the Congressman, this Court presumes it was to aid Burton in receiving a discharge from the Marines. Tr. at 46.

7. Additionally, adding to the confusion regarding when exactly Burton was enrolled at Rochester is his answer to the Defendant's Interrogatories. When asked to list the name and dates of each school he attended in the Interrogatories, Burton listed the "University of Rochester (1982–1986)" and the "State

University of New York (1987–1989)." Def. Exh. E, Interrogatory No. 15.

8. At trial, Burton referred to the hospital as the "VA Hospital." As far as this Court can ascertain, "VA" can refer to Veterans Affairs or Veterans Administration. For the purposes of this Memorandum Opinion this Court will consider the two terms as interchangeable.

9. Given the confusion surrounding Burton's testimony regarding his dates of enrollment in school, this Court is unable to determine where Burton was in college when he first had a problem with cocaine. See supra, fn. 7, at 862. Further, while Burton did testify that he sought help for his drug addiction around 1989, it is not clear if he sought help immediately or if this was some time after his addiction started. It is also unclear from his testimony if he would have been a junior in college in 1989, though one can assume he must have been near his junior or senior year in 1989 since his answer to Defendant's Interrogatories states that he was enrolled in college from 1982 through 1989. Def. Exh. E, Interrogatory No. 15.

Burton testified that he eventually left Buffalo and enrolled at the State University of New York at Brockport ("Brockport"), where he stayed for about a year. He further testified that he left Brockport because he "started having some issues mentally . . . [and] started drinking heavily . . . ." Tr. at 47.

After leaving Brockport, Burton testified that he "kind of floundered around" but then he started "getting [his] life together." Tr. at 49. He worked various jobs, including as a lifeguard and camp counselor, and eventually got a job at Eastman Kodak Company. Burton testified that he worked there for about two years doing factory work, and then transferred to the equipment support division because of a referral from his former wife. He worked in the equipment support division for approximately two years, but left after his divorce.[10]

Burton testified that he moved to Hampton Roads in 1998, and that he moved away from New York "because either I was going to kill myself or kill somebody, basically." Tr. at 51. Further, he testified that someone in the Veterans Affairs Hospital told him that there was a place in Virginia for veterans, and that it could help him start over.

Since moving to Virginia, Burton has had a sporadic employment record, with jobs at Gateway, Nextel, King's Creek Plantation and Real–Time International. Additionally, he testified that the highest

paying job he ever had was with Nextel for $14.00 per hour,[11] and that job only lasted for two months. Burton stated he lost his job with Nextel, where he worked as a customer service representative, because he was having problems with his medication and had to be hospitalized.

According to Burton, he worked at Gateway for two years and that was his longest period of employment.[12] While at Gateway, Burton testified that "things started looking up," and he had a doctor who was working with him and his medications. Tr. at 11. He stated that he was starting to excel at Gateway, but then began to suffer side effects from his medications, such as paranoia and tremors. Further, he testified that he started hearing voices and had to take a lot of time off work, which eventually led to his termination at Gateway.

Burton testified that he worked at King's Creek Plantation for about a year, but that he was terminated when he started having problems with his medication. According to Burton, the problems with his medicine "would make [him] tired during times when [he] was supposed to work," and this led to him requesting time off, which ultimately led to his termination. Tr. at 10.

Burton's most recent job was in 2004 with Real–Time International, where he sold time shares. Burton's answer to the Defendant's Interrogatories reveals that

---

**10.** Burton testified that he got married in 1995 and that the marriage only lasted one year. Relying on Burton's testimony, this means that Burton presumably left Eastman Kodak sometime in 1996 or 1997. Burton testified he moved to Hampton Roads in 1998. He did not testify regarding the time period between leaving Eastman Kodak and moving to Virginia.

**11.** Burton's answer to the Defendant's Interrogatories shows that in addition to the

$14.00 per hour he made at Nextel, he made $11.00 per hour at Gateway; $7.30 per hour at Kings Creek; and $7.00 per hour at Real–Time. Def. Exh. E., Interrogatory No. 4.

**12.** Presumably, when Burton testified that Gateway was his longest period of employment, he meant while living in Virginia, because he also testified that he worked for Eastman Kodak Company for a total of four years.

he only worked twenty-five hours per week at Real–Time, thus making him a part-time employee. Def. Exh. E., Interrogatory No. 4. Further, he testified he worked for Real–Time International for about two months, but then the company closed due to financial problems.

Since working for Real–Time International in 2004, Burton testified that he has attempted to find work. According to Burton, he has attempted to gain employment through a Social Security program; by signing up with the Virginia Employment Commission; and by applying for jobs online.[13] He also testified that he has done odd jobs for a friend to make money, such as digging ditches and building a fence.[14] Additionally, Burton testified that he attempted to operate his own business sometime during the latter part of 2004. He stated that he tried to start a marketing business with the help of Social Security through the Ticket to Work Program. However, he stated that the business did not succeed because he did not have money to purchase materials and that he did not think through how much it would cost to start a business.

Burton testified that he knows how to build computers and he built the computer he presently uses, but that he has been unable to get a job in that field because he lacks Microsoft certification. Burton stated that he has looked into getting computer certification through the Peninsula Work Force Development Center but that he cannot afford the cost of the certification. He testified that it costs approximately $6,000.00 to $8,000.00 to obtain certification with Microsoft and that to his knowledge there are no free programs.

### C. Medical and Family History

As previously noted, Burton's testimony reveals that his medical difficulties initially began when he was a young man in the Marines. He left the Marines in 1981 after receiving a medical discharge. However, he testified that it was not until 1987, when he was at the University of Buffalo, that he began to become aware of mental illness. Burton testified that there was a Veterans Affairs Hospital near where he lived in Buffalo, and that it was there that he started to learn about his illness. Further, he testified that he had a nervous breakdown in 1988. Additionally, in Burton's Complaint, he alleges that he has been in and out of psychiatric hospitals since 1995. Pl. Compl., at 2.

Burton testified that he has been diagnosed with Bipolar disorder, and Burton's Complaint alleges that Hampton Veterans Affairs Hospital determined that he has Bipolar II disorder and a personality disorder. *Id.* Burton also testified that he currently receives Social Security disabili-

---

13. Burton testified that he does online job searches weekly on his computer. He testified that approximately one week before the trial, he responded to an e-mail that he received about a job but that he had not yet received a response. Counsel for ECMC asked Burton whether he had any documents, such as a e-mail or letter, showing he applied for jobs, and Burton responded that he believed those documents were submitted to the Court and counsel. However, this Court is not aware of such documentation. ECMC provided the Court with Defendant's Exhibit F, which is a Request for Admissions. Request Number 14 asked for documentation relating to any job Plaintiff has sought in the last five years. While the response states "SEE ATTACHED" below Request Number. 14, there were no documents attached for the Court to review. Def. Exh. F., Request No. 14.

14. Burton's testimony revealed that he only did these odd jobs so that he could buy gifts for his children and similar expenditures. Therefore, it appears he was only paid a small amount for these odd jobs, and it is unclear if these jobs had much impact on his ability to pay his student loan debts.

ty because of his illness.[15] According to Burton, his illness causes him to have periods of highs followed by periods of depression, engage in risky and self-destructive behavior when he is in a manic stage, and feel depressed and worthless at times. Burton testified that he has attempted suicide approximately three times. Additionally, Burton stated that over the last fifteen years, he has been hospitalized over thirty times. Burton further testified that he has not been hospitalized recently, and that while he does not remember the exact date of his last hospitalization, it may have been around two years since he was last hospitalized.

As previously mentioned, Burton testified that he has had a problem with cocaine, which began around his junior or senior year of college, and that he sought help for this problem on a number of occasions. Burton testified he has been clean and sober now for a little over two years, and that he now does volunteer service work in a 12–step program to help others struggling with addictions.

Additionally, Burton testified that he is currently taking three prescribed medications: Depakote, Celexa and Clonazepam.[16] He stated that he has been taking these three drugs for the past year and that the drugs were prescribed by the Veterans Affairs Medical Center and also by the Peninsula Behavioral Health Center. According to Burton, these medications cause him to feel tired and to experience nausea, tremors, loss of appetite, sleeping problems, and lack of desire for sex. Burton also testified that if he does not take his medicine that he can be difficult to be around, especially because the manic part of his illness makes him talk fast, have a rush of ideas, and have unrealistic expectations. Burton further stated that when he does not take his medicine there are times when it is difficult for him to get out of bed and that he tends to be very antisocial. Burton testified, that in his opinion, he will have to take medication until he dies, because he feels that he will have this condition for the rest of his life.[17]

Burton testified that members of his family also suffer from the same or similar illnesses. He stated that his mother and brother also suffer from Bipolar disorder, and his sister suffers from Schizophrenia. However, he also testified that his mother's illness only recently became apparent, and he did not testify to when his siblings were diagnosed or when their illness became apparent. Additionally, Burton's answer to Defendant's Interrogatories reveals that one of Burton's children has been diagnosed with Depression and Attention Deficit Disorder, and that the child takes Depakote. Def. Exh. E., Interrogatory No. 9.

### D. Testimony Regarding Living Situation and Expenses

Burton testified that he currently lives in downtown Newport News in an efficiency apartment that is part of a Section 8

---

15. According to Burton's Complaint, he was found to be disabled by the Social Security Administration on March 15, 2002. Pl. Compl., at 2.

16. Burton stated that the Clonazepam is prescribed to help him sleep, but that the drug has the potential to be addictive and so he does not always use it. As to the other two medicines, Burton testified generally that they were prescribed medicines, the symptoms he experiences if does not take his medicines, and that they have negative side effects, but he did not testify to the exact reason each drug was prescribed and the symptoms each drug was intended to alleviate.

17. Burton attempted to testify to what he asked his doctor regarding how long he will have to take his medication, but the testimony was objected to as hearsay by the Defendant, and the objection was sustained by the Court.

housing program "for people who are formerly homeless and disabled." Tr. at 3. He stated that he has lived in the efficiency for the past five years and that he moved there from a half-way house.[18] Additionally, he testified that the efficiency consists of one room with a microwave and refrigerator (but no stove), and a bathroom. He also testified that the rent is subsidized, and that initially he only had to pay $25.00 per month, but that he now pays $128.00 per month because he receives Social Security disability.[19]

Burton owns a vehicle, which he testified that he purchased for $100.00 through the Community Housing Partners. He further testified that the vehicle needs repairs, but that it is operable, and that he pays the insurance on it.[20] He also testified that he owns a computer that he built.

He stated that he has access to the Internet through a dial-up connection, which is available at a lower rate to people with a disability.

Burton testified that his only current source of income is Social Security disability, which he has been receiving since 2002. The total amount of his Social Security disability check is approximately $800.00; however, he testified that he receives only $642.00 net from his disability check because part of his check is being garnished for child support.[21] He testified that he has five children, which range in age from 9 to 27 years old, and owes about $28,000.00 in child support arrears. Burton only has present support obligations for three children, since two of the children are over eighteen.[22] He testified that

18. Burton also testified that he has lived at the Veteran Affairs Hospital on a couple of occasions. He testified that on one occasion he lived there for approximately six months and on another occasion for approximately nine months. Tr. at 12.

19. However, it should be noted that Burton also testified that at the time he filed his Schedules in his bankruptcy proceeding, he was paying $342.00 a month. He testified that $342.00 is the amount that Newport News Regional Housing Authority was charging based on his gross income from Social Security. Further, he testified that the Housing Authority was charging him said amount because they were not taking into account his child support deduction, and that they have since adjusted his rent to $128.00 to take into account his child support deduction from his Social Security disability check.

20. Burton testified that there is no provision on his Schedule J for car insurance because at the time he filed for bankruptcy, the vehicle was not running as it was being repaired. However, presently he pays $147.00 per month for insurance.

21. This Court is not entirely sure how to interpret the fact that Burton claims his check is for a little over $800.00, but that he receives $642.00 after a deduction of $274.00 is

made for child support, because mathematically there appears to be some error. For Burton to be paying $274.00 in support and receiving $642.00, his gross disability check would have to equal at least $916.00. However, at another point in the trial, Burton testified that the $274.00 is not currently being deducted from his check; rather it would be deducted starting the following month. Further, he testified that this would decrease his net check to somewhere closer to $600.00 per month. It is possible this confusion regarding the timing of the $274.00 deduction explains the aforementioned mathematical discrepancy.

22. Burton testified that his two eldest children are 19 and 27 years old. His present child support obligations are for the children aged 9, 13, and 14 years. He further testified that one child is from a previous relationship, separate from his marriage, and that while he has been paying support for the child, that he is not the father of the child. Additionally, he testified that the State of New York owes him money since he has been paying support for the child. However, he also testified that the State of New York claims that they do not owe him money, and that he cannot afford to take the issue to court. It is unclear to the Court if Burton was including this contested child as one of the five and/or one of the three

his obligation for current support and arrears is approximately $274.00, which is automatically deducted from his Social Security disability check.[23] Burton stated that the three younger children also receive payments directly from Social Security, along with the $274.00 that is garnished monthly from his Social Security disability check.

Burton also testified about the additional expenses listed on his Schedule J. He testified that his current expenses are still approximately the same as the expenditures he listed on his Schedule J. Further, he testified that he currently spends approximately $70.00 per month on his telephone bill, $300.00 on food, $50.00 on clothing, and $40.00 on gasoline and other related transportation expenses. His Schedule J also reveals $20.00 per month that is budgeted for recreation, and $150.00 for child support. However, now that the child support payment is automatically deducted from his Social Security disability check, he should no longer have the $150.00 child support expense; rather he will have the $274.00 deduction for support taken directly out of his check. Bur-

ton also testified that he currently pays $147.00 per month for car insurance, which is an expense that was not listed on his Schedules because the vehicle was inoperable at the time Burton filed for bankruptcy. This Court therefore calculates that Burton's average monthly expenses are between $750.00 to $1,030.00 per month, with the variation attributed to whether child support is treated as a deduction or expenditure.[24]

## III.

## ARGUMENTS

Burton argues that he has significant medical disorders, including Bipolar II and personality disorder, which prevent him "from engaging in substantial gainful activity." Pl. Compl., at 2. He argues he needs medication in order to function, yet the medication causes nausea, the shakes, and sleeping problems, which makes it difficult for him to maintain steady employment. Further, he argues that his resources are meager, with his sole income being his Social Security disability check.

---

minors, and therefore, whether this child is one of the three he currently helps support.

23. Burton's testimony regarding his support obligations was very confusing and difficult for this Court to interpret. It is not entirely clear if the $274.00 includes arrears and current obligations; however, his testimony seemed to imply that. In Burton's answer to Defendant's Interrogatories, Burton · stated that he pays $29.00 per month for the child born in 1991; $29.00 per month for the child born in 1992; and $219.00 per month for the child born in 1995. Def. Exh. E., Interrogatory No. 6. This calculates to a total of $277.00, which is certainly close to $274.00; however, Burton also testified that he received a court order stating his child support obligation would be increasing and that a larger deduction will be taken from his check the next pay period. Given the conflicting evidence and testimony, the Court is not entirely sure how

to calculate the exact amount Burton pays in support.

24. In arriving at this range, this Court allotted $128.00 for rent, $70.00 for telephone, $300.00 for food, $50.00 for clothing, $40.00 for transportation, $20.00 for recreation, $274.00 for the child support payment, and $147.00 for car insurance. Including the $274.00 as a expenditure makes Burton's expenses equal approximately $1,030.00, while leaving the $274.00 as a deduction results in his expenses being closer to $750.00. This Court recognizes that there was some confusion surrounding the testimony regarding rent and child support; however, this Court feels that the range of $750.00 to $1,030.00 is a fair approximation of Burton's current expenditures. Of course, it should be noted that while calculating child support as a deduction reduces Burton's expenses, it also reduces his net income.

He points to his sporadic work history and his history of often making only $7.00 to $8.00 per hour,[25] as evidence of his inability to pay his student loans and as evidence that paying the loans constitutes undue hardship. Further, Burton argues that he will never earn enough to pay off his educational loans, and that even if he does manage to earn more money, all of that money will go to pay child support arrears.[26] Additionally, he argues that if his income were to increase, his child support obligation would also increase, and therefore, he still would be unable to pay his educational debts. He also argues that while he has not always made payments on his educational debt, he has done the best he could given his limited resources and that he has shown good faith.

ECMC argues that Burton is unable to meet his burden of proof under the *Brunner* test, which establishes a 3–prong test to determine whether an educational debt imposes "undue hardship." *Brunner v. New York Higher Educ. Servs. Corp.*, 831 F.2d 395, 395 (2d Cir.1987). Specifically, ECMC argues that Burton cannot satisfy the second prong of the *Brunner* test. ECMC alleges that Burton is intelligent, articulate, and has had good experience in the past with certain jobs. Additionally, ECMC argues that Burton has been sober for two years, has a good medicinal regimen, and his prospects for the future seem encouraging. ECMC also argues Burton has not exhausted all possible resources to find employment. Further, ECMC argues that there is no evidence to support a finding that Burton cannot work, and that Burton has the burden of proving that he cannot secure employment.

In addition, ECMC argues that Burton has not satisfied the good faith prong of *Brunner*, because Burton has not made a loan payment in thirteen years, and that while Burton alleges he made payments in the past, Burton did not produce documents to prove that fact when requested. Further, ECMC argues that if Burton was acting in good faith he would be willing to take advantage of one of the various loan payment programs ECMC proposed, such as the William D. Ford Repayment Program ("Ford Program"). Additionally, ECMC argues that because payments are based on present income under the Ford Program, Burton's payment would be zero; therefore, Burton should be willing and able to take advantage of the program.

## IV.

## CONCLUSIONS OF LAW

As this Court has recently discussed, student loans are generally non-dischargeable debts. *See Thompson v. New Mexico Student Loan Guarantee Corp. (In re Thompson)*, 329 B.R. 145 (Bankr.E.D.Va. 2005); *Gill v. Nelnet Loan Servs., Inc. (In re Gill)*, 326 B.R. 611 (Bankr.E.D.Va.2005); *Murphy v. Sallie Mae (In re Murphy)*, 305 B.R. 780 (Bankr.E.D.Va.2004). Congress has provided that government-guaranteed student loans are nondischargeable in bankruptcy unless the debtor can demonstrate that the repayment of such student loans would constitute an "undue hardship." 11 U.S.C. § 523(a)(8) (2005).[27]

---

25. Burton's work history suggests that he generally makes between $7.00–$8.00 per hour; however, he did have one job that paid $14.00 per hour. *See supra*, fn. 11, at 863.

26. Burton alleges that he owes $28,000.00 in child support arrears.

27. The citations and quotations in this Memorandum Opinion to Title 11 of the United States Code are to those sections in effect at the time Burton's Complaint was filed, not to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which took effect October 17, 2005.

This exception from discharge of student loans "was enacted to prevent indebted college students or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch),* 258 F.3d 315, 320 (4th Cir.2001) (quoting *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 436–37 (6th Cir.1998)). Section 523(a)(8) of the Bankruptcy Code provides:

> A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt
>
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C § 523(a)(8) (2005).

██ The term "undue hardship" is undefined in the Bankruptcy Code. The Fourth Circuit Court of Appeals has adopted the three-part test articulated in the decision of *Brunner v. New York State Higher Educ. Servs., Corp.,* 831 F.2d 395, 396 (2d Cir.1987). *Educ. Credit Mgmt.*

*Corp. v. Frushour (In re Frushour),* 433 F.3d 393, 400–401 (4th Cir.2005) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 7); *Ekenasi v. Educ. Res. Inst. (In re Ekenasi),* 325 F.3d 541, 546 (4th Cir.2003) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 13). Thus, in order to discharge a government-guaranteed student loan, a debtor "must establish (1) that he cannot maintain a minimal standard of living for himself and his dependents, based on his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *In re Ekenasi,* 325 F.3d at 546 (quoting *Brunner,* 831 F.2d at 396).[28]

██ A determination of the dischargeability of a student loan must be brought by filing an adversary proceeding. *Banks v. Sallie Mae Serv'g Corp. (In re Banks),* 299 F.3d 296, 300 (4th Cir.2002) (citing Fed. R. Bankr.P. 7001(6)). Further, the debtor has the burden to prove all three prongs of the *Brunner* test by a preponderance of the evidence. *In re Frushour,* 433 F.3d at 400–401 (citing *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn),* 339 F.3d 559, 565 (7th Cir. 2003); *Brightful v. Pennsylvania Higher Educ. Assistance Agency (In re Brightful),*

---

**28.** Prior to *In re Frushour* and *In re Ekenasi,* a number of courts within the Fourth Circuit had utilized the *Brunner* factors to analyze whether the repayment of a student loan constituted an undue hardship under Section 523(a)(8) of the Bankruptcy Code. *See Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson),* No. 01–30624, 2002 WL 32155401, at *3 (Bankr.E.D.Va. June 25, 2002); *see also Tennessee Student Assistance Corp. v. Mort (In re Mort),* 272 B.R. 181, 183 (W.D.Va.2002); *Ver-*

mont Student Assistance Corp. v. Coulson (In re Coulson),* 253 B.R. 174, 177 (W.D.N.C. 2000); *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 905 (D.S.C.1995); *Virginia Educ. Assistance Auth. v. Dillon (In re Dillon),* 189 B.R. 382, 384 (W.D.Va.1995); *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack),* No. 99–10637, 2000 WL 33710278, at *4 (Bankr.D.S.C. July 3, 2000); *Walcott v. USA Funds, Inc. (In re Walcott),* 185 B.R. 721, 724 (Bankr.E.D.N.C.1995).

267 F.3d 324, 327 (3rd Cir.2001)) ("The debtor has the burden of proving all three factors by a preponderance of the evidence.").

■ "Generally speaking, the legislative history of Section 523(a)(8) suggests a finding of undue hardship is an exception to the rule, and it must mean more than unpleasantness associated with repayment of a just debt." *Jones v. Nat'l Payment Ctr. (In re Jones)*, 242 B.R. 321, 325 (Bankr.E.D.Va.1998), *aff'd in part and remanded on other grounds sub nom. Educ. Credit Mgmt. Corp. v. Jones*, No. 3:99CV258, 1999 WL 1211797 (E.D.Va. July 14, 1999). As the Fourth Circuit Court of Appeals has recently stated, "[i]nability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship." *In re Frushour*, 433 F.3d at 399–400.

■■ "Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a 'certainty of hopelessness.'" *In re Jones*, 242 B.R. at 325. (quoting *Lezer v. New York State Higher Educ. Servs. Corp. (In re Lezer)*, 21 B.R. 783, 789 (Bankr. N.D.N.Y.1982)). In order to discharge a student loan, a debtor "must show that the unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor [his] obligations." *Id.* (citing *Love v. U.S. (In re Love)*, 33 B.R. 753, 754–55 (Bankr.E.D.Va.1983)). Therefore, it is necessary to assess the evidence presented at trial to determine if Burton has proven that repayment of the student loans owed to ECMC will constitute an undue hardship.

### A. Can Burton Maintain a Minimal Standard of Living?

■ The initial prong of the *Brunner* inquiry requires this Court to assess whether the debtor has proven he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the student loans. *In re Ekenasi*, 325 F.3d at 546 (citing *Brunner*, 831 F.2d at 396). In making this assessment, "a court should examine the debtor's standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents." *U.S. Dep't of Health & Human Servs. v. Smitley (In re Smitley)*, 347 F.3d 109, 117 (4th Cir.2003) (citing *In re Ekenasi*, 325 F.3d at 546; *Rice v. U.S. (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir. 1996)). In contemplation of what constitutes a "minimal standard of living," some courts have equated poverty with such a standard. *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack)*, No. 99–10637, 2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000) (citing *Griffin v. Eduserv (In re Griffin)*, 197 B.R. 144, 147 (Bankr.E.D.Okla.1996)). Other courts have not required that debtors live in poverty in order to satisfy the first *Brunner* prong, instead taking into consideration the debtor's current income and expenses in determining whether the debtor and her dependents, if any, will be able to sustain a "minimal" standard of living. *Id.* (citing *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 907 (D.S.C.1995), *aff'd* 85 F.3d 615 (4th Cir.1996)). Specifically, "[t]he bankruptcy court must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing, and medical treatment are met." *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr.W.D.Wis.1999) (citing *In re Rice*, 78 F.3d at 1149). "Once that determination is made, the question is whether the debtor has additional funds

with which to make payments toward [the debtor's] student loans." *Id.*

A review of decisions within the jurisdiction of the Fourth Circuit indicates that courts generally do not find an inability to maintain a minimal standard of living where a debtor shows a surplus of income over expenses. *Virginia State Educ. Assistance Auth. v. Dillon,* 189 B.R. 382, 385 (W.D.Va.1995) (where debtor testified that she could pay between $50.00 to $75.00 each month on $2,000.00 student loan, there was no undue hardship); *Love v. U.S. (In re Love),* 33 B.R. 753, 754 (Bankr. E.D.Va.1983) (no undue hardship where debtor had $30.00 per month surplus of income over expenses to repay $9,000.00 student loan); *Virginia Educ. Loan Auth. v. Archie (In re Archie),* 7 B.R. 715, 718–19 (Bankr.E.D.Va.1980) (evidence showed a net surplus of $37.13 of income over expenditures even with extraordinarily high telephone bill and clothing expenses to repay approximately $2,000.00 student loan).

In contrast, many of the decisions within the jurisdiction of the Fourth Circuit have permitted a discharge of student loans where there was a substantial deficiency of income to expenses for a debtor. *See, e.g., Vermont Student Assistance Corp. v. Coulson (In re Coulson),* 253 B.R. 174, 178 (W.D.N.C.2000) (first *Brunner* prong met where "debtor's expenses clearly exceed her income, even though debtor has done almost everything possible to maximize her income and minimize her expenses"); *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 907 (D.S.C.1995) (no error where bankruptcy court "found the debtor's current income is $3,800.00 [monthly] with expenses of $4,350.00 and that, with the exception of selling his house, debtor had done everything possible to minimize expenses and maximize income"); *Wilson v. Educ. Credit Mgmt.*

*Corp. (In re Wilson),* No. 01–30624, 2002 WL 32155401, at *3 (Bankr.E.D.Va. June 25, 2002) (discharge permitted where debtor had monthly expenses of $1,829.03 and income of $1,578.99); *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack),* No. 99–10637, 2000 WL 33710278, at *5 (Bankr.D.S.C. July 3, 2000) (partial discharge permitted where debtor's monthly expenses were $2,446.48 and income was $2,078.00); *Reilly v. United Student Aid Funds, Inc.,* 118 B.R. 38, 41 (Bankr.D.Md. 1990) (discharge permitted where $600.00 per month deficiency of income to expenses). While it is certain that a proper analysis of whether the debtor may maintain a minimal standard of living and repay a student loan entails many considerations other than the existence or not of a deficiency of monthly income to expenses, nonetheless these decisions provide insight into the living circumstances which compel a court to find satisfaction or not of the initial *Brunner* prong.

■ In the present case, the first *Brunner* prong is easily satisfied. The Court believes that Burton presently cannot maintain a minimal standard of living if forced to repay on his student loan debt. Burton has virtually no discretionary income. He is not presently employed, his only income is a Social Security disability check, and his expenses clearly exceed his income. Burton's Schedules reveal that at the time he filed for bankruptcy, his total monthly income was $680.00 and his total monthly expenses were $972.00. Additionally, he listed a combined total of $207,341.00 for secured and unsecured debts on his Schedules. Of this amount, Burton listed that he owed $66,800.00 in child support collections, $96,156.00 to ECMC for student loans, $12,087.00 to New York State Higher Education Services, and $22,296.00 to Sallie Mae Consolidation for student loans.

At trial, Burton's testimony regarding income and expenses differed slightly from his Schedules. Burton testified that he owes approximately $28,000.00 in child support arrears and approximately $100,000.00 in student loans.[29] Further, Burton testified that his gross Social Security disability check is over $800.00, and his net check is currently $642.00 because of child support garnishments, but that in the future his net check will be closer to $600.00 because of additional child support garnishment.[30] Additionally, Burton's current total monthly expenses differ slightly from the expenses listed in his Bankruptcy Schedule J. Burton testified that the $150.00 for child support as listed on his Schedule J is now being deducted directly from his Social Security disability check and the deduction has increased to $274.00 per month. In addition, his Schedule J does not provide for the $147.00 Burton currently pays monthly for car insurance. Burton did not state the total amount of his current monthly expenses; however, the Court calculates that Burton's current monthly expenses range between $750.00 to $1,030.00, depending on whether the child support obligation is counted as a expenditure.[31] Further, this Court, relying on Burton's testimony and his Schedule J, finds that Burton likely receives approximately $600.00 per month, after deducting the child support payment, to pay approximately $750.00 in expenses. While Burton's Schedules differ slightly from his current income and expenses, and his testimony was convoluted at times, it is never-theless clear to this Court that Burton's expenses exceed his income.

Additionally, the Court's examination of whether Burton's scheduled expenses are reasonable in light of his financial situation reveals that there appears to be little opportunity for minimization. Burton's expenses appear to be for necessary living expenses, and his budget appears to contain no luxury or frivolous expenses that could be cut out. "A necessary living expense is one that the debtor cannot cut from the budget and still maintain a minimal standard of living." *Smith v. Educ. Credit Mgmt. Corp. (In re Smith)*, 328 B.R. 605, 612–13 (1st Cir. BAP 2005) (citing *Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835, 841 (1st Cir. BAP 2004)). While Burton could potentially attempt to reduce his phone or food bill, which he testified is $70.00 and $300.00 per month respectively, neither expense is excessive.

Burton is living in a one-room efficiency apartment that is part of a Section 8 housing program. Further, he testified that he currently pays or will be paying approximately $274.00 per month for current and past due child support for five children, three of which are minors. While the Court is not entirely sure of the exact amount or how it is divided between the children[32] the evidence shows that even ignoring the issue of repayment of loans, Burton is unable to afford all of his expenses and the expenses of his dependents. Thus, the evidence demonstrates that Burton cannot maintain a minimal standard of living if forced to repay the

29. *See supra* fn. 3, at 861, for a discussion of Burton's testimony regarding how much he owes in student loans.

30. *See supra* fn. 21, at 866, for a discussion of Burton's testimony regarding his monthly gross and net Social Security disability check amounts.

31. *See supra* fn. 24, at 867, for the Court's discussion regarding its calculation of Burton's monthly expenses.

32. For a discussion regarding the difficulty in interpreting Burton's child support obligation, *see supra* fns. 21–23, at 866 – 867.

student loans. However, in order to be entitled to a discharge under 11 U.S.C. § 532(a)(8), Burton has to meet his burden under all three *Brunner* prongs; therefore, the Court will address the remaining two *Brunner* prongs.

B. Are There Additional Circumstances Indicating That Burton Will be Unable to Maintain a Minimal Standard of Living During a Significant Portion of the Loan Repayment Period?

█ The second *Brunner* prong requires a student loan debtor to establish that additional circumstances indicate that the debtor's inability to maintain a minimal standard of living for himself and his dependents if required to repay the student loans is likely to exist for a significant portion of the repayment period of the student loans.[33] *Ekenasi v. Educ. Res. Inst. (In re Ekenasi)*, 325 F.3d 541, 546 (4th Cir.2003) (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987)). Further, the Fourth Circuit of Appeals has instructed as to the criticality of the second *Brunner*

prong: "[t]his factor is the heart of the *Brunner* test ... [t]he second factor is, therefore, a 'demanding requirement' and necessitates that a 'certainty of hopelessness' exists that the debtor will not be able to repay the student loans." *In re Frushour*, 433 F.3d at 400–401 (quoting *Brightful v. Pennsylvania Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 328 (3rd Cir.2001)).

Burton argues that he has attempted unsuccessfully to obtain employment, and that even if he can find employment, it is unlikely that he can obtain a job that pays significantly above minimum wage, and that therefore, his current financial situation is unlikely to change. He testified that he has a history of losing jobs because of his medical condition and specifically because of the problems that often resulted due to side effects of his medications. Additionally, Burton's counsel argues that the test is undue hardship, and that Burton cannot currently pay on these loans unless he undertakes some drastic measure to curtail his expenses. Further,

---

**33.** Some courts have utilized the following nonexhaustive list when analyzing facts under the "additional circumstances" prong of *Brunner:* (1) serious mental or physical disability of the debtor or the debtor's dependents, which prevents employment or advancement; (2) the debtor's obligations to care for dependents; (3) lack of, or severely limited education; (4) poor quality of education; (5) lack of usable or marketable job skills; (6) underemployment; (7) maximized income potential in the chosen educational field, and no other more lucrative job skills; (8) limited number of years remaining in work life to allow payment of the loan; (9) age or other factors that prevent retraining or relocation as a means for payment of the loan; (10) lack of assets, whether or not exempt, which could be used to pay the loan; (11) potentially increasing expenses that outweigh any potential appreciation on the value of the debtor's assets and/or likely increases in the debtor's income; and (12) lack of better financial options elsewhere. *Nys v. Educ.*

*Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 446–47 (9th Cir. BAP 2004) (citations omitted).

Several courts within the Fourth Circuit have considered similar circumstances when analyzing facts under this prong of *Brunner*. *See Educ. Res. Inst. v. Ekenasi*, 271 B.R. 256, 262 (S.D.W.Va.2002), *rev'd on other grounds*, 325 F.3d 541 (4th Cir.2003) (citation omitted) (considering "illness, incapacity, and other extenuating circumstances of the debtor or the debtor's family"); *Perkins v. Pennsylvania Higher Educ. Assistance Agency (In re Perkins)*, 318, B.R. 300, 310 (Bankr.M.D.N.C. 2004) (examining such circumstances as "medical problems lack of usable job skills or severely limited education, or large numbers of dependents").

While all of these considerations could certainly be relevant if the facts so present themselves, this Court declines to adopt the type of framework set forth by the court in *Nys* until such time as the Fourth Circuit Court of Appeals instructs otherwise.

Burton's counsel argues that even if Burton's income was to increase, because of his child support payments and arrears, he still would not be able to pay on his student loans.[34]

In contrast, ECMC argues that Burton has the burden to prove that his current financial situation will persist into the foreseeable future and that Burton did not meet his burden. Counsel for ECMC argues that his perception of Burton is that he is intelligent, articulate, and that he has had good experience in the past with certain jobs. To bolster the argument that Burton's future prospects sound encouraging, ECMC points to the fact that Burton has been sober for two years, testified to being on a good medicinal regimen and testified to doing volunteer work. In addition, counsel for ECMC argues that he thinks Burton can find a job, that it is Burton's burden to prove that he cannot work, and that Burton did not present evidence to support such a finding.

This Court's determination of the second prong of *Brunner* presents a difficult question in this case, and a question that is unfortunately made more difficult because of the lack of corroborating evidence presented. Burton appears unwilling or unable to maintain steady employment, and he has been unemployed since June 2004.

Additionally, his employment in 2004 only lasted two months and was a part-time job where he made $7.00 per hour. Further, in the last five years, Burton's most lucrative period of employment, in which he made $14.00 per hour working 40 hours per week, also lasted only two months.[35] This Court believes that Burton has suffered many hardships, such as hospitalizations and job losses, and that he has had a difficult time remaining consistently employed. However, the difficulty with this prong for the Court lies in the fact that while Burton testified to a difficult employment history where he was incapable of sustaining permanent lucrative employment, it is equally clear that this inability to sustain long-term employment was due largely to his medical problems. Despite this, however, Burton did not present any evidence besides his own testimony regarding how his medical condition will impact his ability to sustain future long-term employment.

The majority rule is that substantial and credible evidence, such as corroborating evidence, must be presented for the debtor to sustain his burden of proof regarding his medical condition. As one court stated, "[t]his Court closely scrutinizes claims for undue hardship based upon psychological or emotional disability due to the sus-

---

34. Several courts within the Fourth Circuit have discussed that a large number of dependents may be a factor in determining undue hardship under the second prong of *Brunner*. *In re Frushour*, 433 F.3d at 400–401 (citing *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir.2005)); *In re Perkins*, 318 B.R. at 310 (citing *In re Roberson*, 999 F.2d 1132, 1137 (7th Cir.1993)). While Burton testified to having minor children and support obligations for the children, he further testified that none of the children live with him. In addition, Burton testified to having trouble meeting his child support obligations and arrears, and Burton's counsel argued that Burton's child support obligations

would always come first; however, this Court has no evidence regarding whether Burton's child support obligations would increase were his income to increase, and if so, the approximate amount the support obligation would increase. *See supra* fns. 21 and 23, at 866–867.

35. Burton testified that he worked at Eastman Kodak Company in the early 1990's for a period of four years; however, he did not testify as to how much money he made during that time period. Further, Defendant's Interrogatories only asked for Burton's employment history for the past five years. Def. Exh. E., Interrogatory No. 4.

ceptibility of such claims to fabrication, exaggeration and fraud. Well qualified and substantiated expert testimony is essential." *Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey)*, 287 B.R. 132, 136, 143 (Bankr.D.Vt.2001) (granting discharge of student loans based in large part on corroborating medical evidence presented by the debtor to substantiate her medical claims, including testimony from her psychiatrist that the debtor had been diagnosed with a number of major depressive disorders, that these maladies would prevent her from normal functionality in a work setting, and that the debtor's condition is worsening and incurable); *see also Tirch v. Pennsylvania Higher Educ. Assistance Auth. (In re Tirch)*, 409 F.3d 677, 681 (6th Cir.2005) (denying discharge of student loans when the only evidence presented at the trial court level was the debtor's testimony that she was unable to work, which was "unsupported by competent medical or psychological evidence"); *Rose v. Educ. Credit Mgmt. Corp. (In re Rose)*, 324 B.R. 709, 712 (8th Cir. BAP 2005) (denying discharge based in part on the fact that the student loan debtor had presented "no evidence ... that she has health issues that will in the near future prevent her from working"); *Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 419 (Bankr.E.D.N.Y.2004) (finding that debtor's failure to provide corroborating evidence from a physician or psychotherapist precluded a hardship discharge based on a mental condition, stating that "[s]tudent loan debtors claiming undue hardship as a result of a medical condition must provide evidence to corroborate their claims"); *Burkhead v. U.S. (In re Burkhead)*, 304 B.R. 560, 563–66 (Bankr.D.Mass.2004) (denying the debtor's request for a hardship discharge despite the fact that the debtor produced a 24–page summary of prior medical history at trial to support her hardship claim, be-

cause the court was not convinced, based on its review of her records and because the debtor "did not call any expert witnesses to testify about her long-term prognosis," that she had a condition that precluded her from ever earning enough to repay); *Pace v. Educ. Credit Mgmt. Corp. (In re Pace)*, 288 B.R. 788, 793 (Bankr. S.D.Ohio 2003) (refusing to discharge debtor's student loans because the debtor's claims were not "corroborated by testimony or even an affidavit of any physician or other medical professional, familiar with her condition," and noting that "it is not possible to make a discharge determination without some corroboration of the medical conditions and how long they will persist"); *Garrett v. N.H. Higher Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 364 (Bankr.D.N.H.1995) (finding that even though the debtor testified that she had been positively tested for multiple sclerosis, there was no medical evidence adduced at trial that multiple sclerosis had been established, and therefore "the evidence on [the debtor's] health condition [was] insufficient to determine whether it will substantially affect her employment in the future"); *Daugherty v. First Tenn. Bank (In re Daugherty)*, 175 B.R. 953, 959 (Bankr.E.D.Tenn.1994) (denying discharge of student loan based, to a large extent, on the fact that the record contained "no proof, other than her own testimony, that she is unable to work").

Requiring at least some expert testimony to substantiate what otherwise could be self-serving testimony on the part of the debtor

> tacitly reflects the courts' recognition that the reason an expert witness is given testimonial latitude much broader than that granted to a lay witness is that he is assumed to have a 'reliable basis in the knowledge and experience in his discipline.' Laypersons simply do not have

a reliable basis to render a medical diagnosis and prognosis, which are required to support medical hardship discharge claims.

Craig P. Gaumer, *Use Expert Witness Testimony in Student Loan Hardship Discharge Litigation,* 23 AM. BANKR. INST. J. (2004) (citations omitted); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Bugos v. MIT (In re Bugos),* 288 B.R. 435, 436–37 (Bankr.E.D.Va.2003) (denying discharge of student loans because there was no corroborating medical testimony presented at trial, and the debtor's testimony regarding her symptoms and predicting whether they will substantially disable her for a substantial period of time was beyond her "knowledge, background, and expertise").

The majority of the cases that this Court is aware of that have found discharge appropriate based on medical disability share a common thread that is simply not present in the instant action: that corroborating medical evidence was proffered as to the applicable disabilities to substantiate what would otherwise be merely self-supporting testimony by the debtor seeking to discharge the debt. *See Kline v. U.S. (In re Kline),* 155 B.R. 762, 764–65 (Bankr. W.D.Mo.1993) (discharging of student loans of debtor, who appeared extremely agitated at trial and experienced shaking, jerking, nervous tics, and episodes of heavy weeping, due in large part to the submission into evidence of various corroborating medical reports, records, and diagnoses of depression, anxiety disorder, and panic attacks, from at least three of her treating physicians); *Dyer v. Univ. of Tenn. (In re Dyer),* 40 B.R. 872, 873–74 (Bankr.E.D.Tenn.1984) (finding based on the expert medical testimony and written medical diagnoses introduced as well as its own observations, that it was "reasonably certain that the debtor cannot possibly cope with full-time employment," and therefore the debtor's student loan debt should be discharged); *Dresser v. Univ. of Maine (In re Dresser),* 33 B.R. 63, 64–65 (Bankr.D.Me.1983) (finding student loans dischargeable based on expert medical testimony from a psychiatrist and doctors at the treating hospital, that the student loan debtor, who suffered from delayed post-traumatic stress disorder from his service in Vietnam, had been hospitalized twice, visited a psychiatrist once a week, and took daily medication for depression, headaches, and to enable him to sleep at night, was most likely unemployable due to his condition and could remain that way indefinitely); *see also Nelson v. Pennsylvania Higher Educ. Assistance Agency (In re Nelson),* 183 B.R. 972, 977 (Bankr.S.D.Fla. 1995) (finding that a discharge should be granted in a case where the debtor put on trial testimony from her treating psychiatrist that she had been diagnosed with Recurrent Major Depression with Psychotic Features and slight Paranoia, which was not likely to improve and would "prevent her from functioning as a participating member of society and maintaining a job which would allow her to become totally self-supportive"); *Binder v. U.S. Dep't of Educ. (In re Binder),* 54 B.R. 736, 740 (Bankr.D.N.D.1985) (finding that a debtor who had been diagnosed with depressive neuroses and bipolar disorder by four psychiatrists and "several psychologists and sociologists," and who had been placed on at least six different forms of medication, including Lithium, was sufficient to prove that the debtor's mental condition sufficiently impacted his ability to "obtain and maintain adequate financial resources during the foreseeable future," and thus his student loan debt was dischargeable).

This Court is not unaware or unsympathetic to the difficulties debtors face in attempting to subpoena professionals to testify at trial. Burton, given his limited Social Security disability income, is clearly not a wealthy individual and thus has obvious financial limitations to his ability to present evidence at trial. Additionally, many debtors who are in financial straits are unable to afford private health insurance, which creates its own set of complexities. As one case discussed, "if debtors are even able to obtain medical treatment, they ordinarily do not have access to private health care. Therefore, it is challenging for debtors to enlist the help of medical professionals, particularly experts, in the prosecution of their case." *Mosley v. Gen. Revenue Corp. (In re Mosley)*, 330 B.R. 832, 843, 845 (Bankr.N.D.Ga.2005) (holding that the *pro se* debtor met his burden even without expert testimony, in light of the fact that the debtor was *pro se* and attempted unsuccessfully to submit numerous documents to the court). Burton did not explain to the Court why he chose not to present expert testimony or documentation, such as medical records or prescriptions; however, Burton did hint at the complexity of being forced to rely on government-sponsored medical care. Burton discussed at trial the fact that he has been "having some issues with the doctors at the VA due to this matter [ ] they kind of frown upon having to be involved in any legal matters." Tr. at 21. While Burton clearly testified to the apparent policy of the Veterans Affairs regarding their preference to not be involved in legal matters,

he did so in the context of explaining who was prescribing his medications and not in the context of why he did not present any expert medical testimony or records. In fact, on August 1, 2005, Burton subpoenaed Kay Taylor, of the Hampton VA Medical Center,[36] for the trial, but he withdrew this subpoena approximately one week before trial and did not explain this withdrawal to the Court.[37]

Cases that involve debtors that lack the resources to pay experts to testify at trial as to debtors' medical conditions undoubtably create a paradox. One court discussed this paradox in the context of *pro se* debtors and stated, "[o]n the one hand, this debtor ... lacked the money to pay treating or expert medical professionals to come to court and testify· on his behalf. On the other hand, most judges are laypersons and require some medical evidence to determine the nature, extent and likely duration of a disability." *Norasteh v. U.S. Dep't of Educ. (In re Norasteh)*, 311 B.R. 671, 678–79 (Bankr.S.D.N.Y.2004) (citations omitted) (where the debtor presented no corroborating medical evidence to support a hardship discharge, the court found that at a minimum, "a borrower seeking 'an undue hardship' discharge must provide corroborative evidence that he had an impairment that prevent[ed] him from earning enough to repay his student loans, and that the impairment is likely to persist well into the future," even though "the Court's own observations of the debtor and consideration of his employment history raise substantial doubt

---

**36.** This Court does not know if Kay Taylor was an expert, custodian of records, or some other type of witness. A review of the subpoena shows Ms. Taylor as a "PMHNP" and associates her with the Hampton VA Medical Center.

**37.** Additionally, in the Defendant's Request for Admissions, Burton was asked to provide

documents which substantiate and contribute to the existence of undue hardship. Burton's response was "SEE ATTACHED." Def. Exh. F., Request Nos. 4–6. However, in the documents admitted into evidence by this Court and stipulated to by the parties, there were no such attachments. *See* Stipulation of Facts and Evidence, October 26, 2005.

that he will ever earn enough to repay his student loans, and, at the same time, maintain a minimal standard of living. . . .").

Another court discussed this conflict between the need for corroborating evidence and some debtors' limited resources, and suggested that due to the nature of the dischargeability litigation, the testimony of medical experts is a luxury most debtors cannot afford. *Doherty v. United Student Aid Funds, Inc. (In re Doherty)*, 219 B.R. 665, 669 (Bankr. W.D.N.Y.1998). In that case, the court found, based solely on the debtor's testimony, without any additional supporting medical testimony or evidence, that the debtor suffered from Bipolar disorder, which evidenced "additional circumstances" that the debtor's current financial situation was likely to persist for a significant portion of any repayment period and therefore, that the debtor was entitled to a discharge of her student loans. *Id.* at 669–72. In reaching this conclusion, the court took judicial notice of a number of matters, including: (1) that "antidepressant drugs often have an effect on manic depressives that exacerbates the condition they are intended to alleviate;" (2) that there is no known cure for Bipolar disorder; (3) that the debtor "will have to continue taking lithium to regulate her mental functioning for the rest of her life;" (4) the description of Bipolar disorder and its effects, as presented by the National Institute of Mental Health's DEPRESSION/Awareness, Recognition and Treatment ("D/ART") campaign; and (5) that "the most probable near-future for a debtor who suffers from a diagnosed and treated manic-depressive disorder is maintenance of the status quo." *Id.* at 666–71. Outside of these matters in which the court elected to take judicial notice, the information available to the court pertaining to the debtor's mental condition and its effects came solely from the debtor's testimony. *Id.* at 669. The Court respects the decision of the court in *In re Doherty* to take judicial notice given the dilemma that debtors often cannot afford to hire medical experts; however, this Court concurs with the majority in finding that some corroborating evidence is necessary in these type of cases.[38]

**38.** The majority view on the subject is that some evidence is necessary to corroborate the debtor's testimony in order to make a finding that the debtor's medical condition will have a long-term impact on his employment opportunities. However, a minority of courts, especially where the debtor suffered from a mental disorder, have taken judicial notice of the lack of future employment opportunities for people suffering such disorder. *Mosley v. Gen. Revenue Corp. (In re Mosley)*, 330 B.R. 832, 832 (Bankr.N.D.Ga.2005); *see also Green v. Sallie Mae Serv'g Corp. (In re Green)*, 238 B.R. 727, 727 (Bankr.N.D.Ohio 1999); *Thomsen v. Dep't of Educ. (In re Thomsen)*, 234 B.R. 506, 513 (Bankr.D.Mont.1999) (finding that bipolar disorder is a serious and ongoing mental disability and holding that such a conclusion is corroborated by VA disability pension payments).

As previously stated, this Court respects the decisions of the courts that have permitted a hardship discharge without corroboration of the debtor's medical condition; however, this Court is not equipped to take the role of a medical professional nor is it appropriate for this Court to make a medical diagnosis that Burton's prognosis is unlikely to improve. Additionally, the cases that have found for the debtor without corroboration are in the minority and at least one of the cases appears to have facts distinguishable from the present case. *In re Mosley*, 330 B.R. at 832 (finding for the debtor in the absence of corroboration, based in part, on the reasoning that the debtor was *pro se* and attempted to, albeit unsuccessfully, offer corroborating evidence in the form of letters from healthcare providers and the Department of Veterans Affairs).

In sum, while this Court respects the decisions of the other courts that have determined that mental illness is a serious medical disability that prevents the debtor from obtaining future meaningful employment, this Court will not make a futuristic diagnosis without some corroboration. Additionally, while this

This Court, in light of the paradox discussed, and the fact that other credible evidence often exists, does not suggest expert testimony is the only method of corroboration available to debtors. The court in *In re Swinney*, in denying discharge, held similarly and found that "the Debtor, beyond her self-supporting statements, did not introduce any evidence of her mental illnesses," and therefore held:

> Although such evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position .... For example, if properly authenticated, letters from a treating physician could be utilized.

*Swinney v. Academic Fin. Servs. (In re Swinney)*, 266 B.R. 800, 805 (Bankr. N.D.Ohio 2001) (citations omitted); *see also Chime v. Suntech Student Loan (In re Chime)*, 296 B.R. 439, 445 (Bankr. N.D.Ohio 2003) (agreeing that "some corroborating evidence must be introduced to substantiate the debtor's position," and that "bare allegations simply will not suffice").

The *Swinney* court additionally noted that "in line with the Congressional policy of making student loans more difficult to discharge, substantial credible evidence must be given which supports the existence of the ... illness." *In re Swinney*, 266 B.R. at 805 (citing generally *Hatfield v. William D. Ford Fed. Direct Consolidation Program (In re Hatfield)*, 257 B.R. 575, 581–82 (Bankr.D.Mont.2000)). Thus, while extensive expert medical testimony may not be necessary in the student loan discharge context, this Court finds, as the court in *Swinney* did, that the evidence should consist of "more than simply bare allegations," which, under certain circumstances, can come in forms other than expert testimony. *Id.* However, because no corroborating evidence was presented in this case, the issue of the amount of corroborating evidence necessary is not before the Court.

In the present case, Burton failed to present any corroborating evidence beyond his own testimony. He presented no corroborating evidence about his future job prospects as to how his diagnosis impacts his future prospects for generating income. Burton did testify to numerous hospitalizations and three suicide attempts; however, he did not offer any corroboration of these events, such as medical records. He also testified that he takes three prescription drugs; however, he did not attempt to introduce the prescriptions or the pill bottles into evidence.[39] In fact, the

---

Court respects the fact that at least one court accepted VA disability pension payments as corroboration, this Court is not prepared to determine whether that means Burton cannot work in the near future. This Court requires additional corroborating evidence before it can make such a finding. Further, at least one court found that the decision of whether to accept disability pension payments as corroboration falls under the umbrella of judicial discretion. *Nash v. Connecticut Student Loan Found. (In re Nash)*, 330 B.R. 323, 327 (D.Mass.2005) (affirming that the debtor had not met her burden because she failed to present "evidence as to her prospects for generating income following a continued course of medical treatment," and ruling that while the debtor's entitlement to [Social Security Disability] spoke to the debtor's continuing disability, "the judge was justified in being unpersuaded in the absence of evidence ....").

**39.** Additionally, while Burton testified to symptoms he experiences if he does not take his prescribed medications, he did not testify to the exact reason each drug was prescribed. *See supra* fn. 16, at 865. Further, this Court has no independent knowledge regarding the symptoms Depakote and Celexa are intended

only potentially corroborating evidence introduced was the fact that Burton receives Social Security disability, but even in regard to his Social Security disability, there was no documentation presented at trial.[40]

Similar to the instant matter is *In re Nash*, where the debtor, who suffered from Bipolar, was the only witness at the trial and presented no expert testimony or evidence regarding her prospects for generating income following a continued course of medical treatment. *Nash v. Connecticut Student Loan Found. (In re Nash)*, 330 B.R. 323, 327 (D.Mass.2005). The bankruptcy judge denied the debtor's request for discharge and held that the debtor had not met her burden because she failed to present evidence regarding her prospects for generating income in the future. *Id.* at 323. The debtor appealed, and the district court held:

> To be sure, there was evidence that would have supported a conclusion that

[the debtor's] disorder was likely long-term. For one thing, it had already persisted for some years. Her entitlement of SSDI benefits spoke to the genuineness of a continuing disability. Nonetheless, the judge was justified in being unpersuaded in the absence of evidence which met the question of prognosis head-on. As the judge put it, the debtor failed to present sufficient evidence that she will never have the ability to repay these student loans. She presented no expert testimony. She presented no evidence as to her prospects for generating income following a continued course of medical treatment.

*Id.* at 327. This Court is also concerned about the lack of evidence presented regarding Burton's prospects for generating income, especially in light of the fact that he testified to currently being on a good medicinal regimen.[41] Similarly, this Court

---

to alleviate, and without performing external research this Court has no ability to determine the significance of these drugs.

**40.** Some courts have held that Social Security disability constitutes corroboration. *See United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1113–14 (9th Cir.1998) (testimony of the debtor, who had been variously diagnosed with "depression, manic depression (bipolar disorder), schizophrenia and paranoia" and had been hospitalized for her mental disabilities, was sufficiently corroborated by evidence of an $8,000.00 related back disability award, continuing disability payments, and the letter notifying her she would receive disability payments, to entitle the debtor to a discharge of her student loans); *Thomsen v. Dep't of Educ. (In re Thomsen)*, 234 B.R. 506, 513 (Bankr.D.Mont. 1999).

These cases, in allowing disability awards to constitute corroboration, relied on the nature of the disability of the debtor and found that certain mental illnesses are by their very nature ongoing for the foreseeable future. As this Court previously stated, it is not equipped

to unilaterally make such a medical determination regarding mental illness. Additionally, these cases finding that disability payments constitute corroboration are in the minority, and at least one decision was based, in part, on facts which are not present in the case at issue. *In re Pena*, the court noted that "[a]ccording to [the debtor], the administrative judge who awarded her disability benefits found her to be permanently mentally disabled. Although this was hearsay evidence, [the creditor] did not object." *In re Pena*, 155 F.3d at 1113. In the present case, when Burton attempted to testify regarding his doctors' medical prognosis for his future, ECMC objected on the grounds of hearsay. *See supra* fn. 17, at 865.

In addition, as previously discussed, at least one court found that the decision to consider such disability payments as persuasive or unpersuasive evidence of a continuing disability falls under the umbrella of judicial discretion. *Nash v. Connecticut Student Loan Found. (In re Nash)*, 330 B.R. 323, 327 (D.Mass.2005); *see supra* fn. 38, at 878.

**41.** Burton testified that he lost his most recent job at Real–Time International in 2004

finds that while testimony about Burton's Social Security disability payments supports a finding of Burton's past and present medical problems, the evidence does not justify or support a finding that Burton is unable to obtain or maintain meaningful future employment. Therefore, a debtor's recitation, no matter how credible or sympathetic, of his own medical history, is not enough to satisfy the debtor's burden about future possibilities of employment and student loan repayment when the future possibilities are so closely aligned to medical disabilities.

In sum, this Court finds that the overwhelming weight of authority on this issue reflects the general rule that a student loan discharge should not be granted based on undue hardship unless there has been some documentary or testimonial corroborating medical evidence proffered to substantiate the claims of the debtor. By its powers of observation, the Court can note that Burton testified to a lengthy and arduous medical history, and that at times his testimony was confusing and difficult to interpret, which appeared due to Burton's difficulty in remembering facts, such as

dates and names. However, the Court is neither equipped to be, nor is it appropriate for the Court to undertake the role of, a medical professional in order to determine this issue. The Court must analyze only the evidence that is placed before it, and in the instant matter, that evidence is insufficient to make the factual determination that Burton suffers a serious mental disorder that will make it impossible for him to procure and maintain future employment indefinitely and thereby be unable to repay the student loans or even a portion of the amount.[42] Thus, Burton has not satisfied the second *Brunner* prong and has failed to show that additional circumstances exist to indicate that Burton will be unable to maintain a minimal standard of living during a significant portion of the loan repayment period. *Brunner* requires that the debtor meet each of its three prongs independently; therefore, Burton's failure to meet the second prong mandates that he has failed the *Brunner* test in its entirety. Nonetheless, the Court will address the final *Brunner* prong.

---

because the company closed due to Real–Time's financial problems. Further, he testified that Real–Time was flexible with the schedule and understood about his medications; therefore, there is nothing from the record that suggests that Burton could not potentially have stayed continuously employed had it not been for Real–Time's financial difficulties. *See* Tr. at 23.

42. This Court does not dispute that Burton has had a difficult past. However, given the evidence presented, this Court cannot, without making a medical diagnosis, make a factual determination that Burton's medical disabilities will hinder him from obtaining and sustaining employment. Burton is well-educated which is evidenced through the fact that while he does not have a bachelor's degree, he did earn enough or almost enough credits to receive a degree. Further, he testified that he built his own computer. Additionally, he testified that he is forty-four years old, he has

not been hospitalized in the last two years, he has been clean and sober for the last two years, and that he is currently on a good medicinal regimen. Without additional evidence about the nature of Burton's illness, the aforementioned testimony suggests that Burton is, or could be, employable in the near future.

This Court has considered, though not raised by either party, whether Burton is eligible to receive a partial discharge pursuant to Section 105(a) in the instant matter. However, the majority rule is that the debtor must meet his burden of proof as to undue hardship under Section 523(a)(8) before the Court can consider the remedy of partial discharge. *Gill v. Nelnet Loan Services, Inc. (In re Gill),* 326 B.R. 611, 643–44 (Bankr.E.D.Va.2005). Therefore, since Burton did not meet his burden of proof on the issue of undue hardship, this Court cannot consider whether a partial discharge should be granted to Burton.

## C. Has Burton Demonstrated a Good Faith Effort to Repay?

 The third prong of the *Brunner* test requires a court to measure whether a debtor has made a good faith effort to repay the outstanding student loans. This final factor recognizes that "[w]ith the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Goulet v. Educ. Credit Mgmt. Corp.,* 284 F.3d 773, 779 (7th Cir.2002) (quoting *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir. 1993)). This encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Elebrashy v. Student Loan Corp. (In re Elebrashy),* 189 B.R. 922, 928 (Bankr.N.D.Ohio 1995) (quoting *In re Roberson,* 999 F.2d at 1136).

 "In determining whether a debtor has made a good faith effort to repay a student loan obligation, a primary consideration is whether the debtor actually made any payments on the obligation, and if so, the total amount of payments." *Hall v. U.S. Dep't of Educ. (In re Hall),* 293 B.R. 731, 737 (Bankr.N.D.Ohio 2002) (citing *Green v. Sallie Mae Serv'g Corp. (In re Green),* 238 B.R. 727, 736 (Bankr. N.D.Ohio 1999)). Some courts have concluded, however, that a debtor who fails to make payments on a student loan is not necessarily foreclosed from a finding of a good faith effort to repay, reasoning that good faith encompasses all relevant factors. *Id.* Additionally, where a debtor has made no payments on a student loan obligation, courts nonetheless have not precluded a finding of good faith where the debtor has no funds to make any repayments. *In re Elebrashy,* 189 B.R. at 928 (citing *Conner v. Illinois State Scholarship Comm'n (In re Conner),* 89 B.R. 744, 749 n. 18 (Bankr.N.D.Ill.1988); *Courtney v. Gainer Bank (In re Courtney),* 79 B.R. 1004, 1011 (Bankr.N.D.Ind.1987)).

 One court has suggested a compendium of considerations in determining whether a debtor has made a good faith effort to repay a student loan:

(1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;

(2) whether the debtor has realistically used all their [sic] available financial resources to pay the debt;

(3) whether the debtor is using their best efforts to maximize their [sic] financial potential;

(4) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt;

(5) the percentage of the student loan debt in relation to the debtor's total indebtedness;

(6) whether the debtor obtained any tangible benefit(s) from their student loan obligation.[43]

---

**43.** This Court disagrees that the tangible benefit a debtor obtained from a student loan obligation is properly a factor in the consideration of good faith. It is not appropriate for this Court to consider the "value" of a debtor's chosen education but rather only to assess whether the three prongs of *Brunner* have been satisfied. *See Brunner v. New York State Higher Educ. Servs. Corp. (In re Brun-* ner), 46 B.R. 752, 755 (S.D.N.Y.1985); *Raymond v. Northwest Educ. Loan Assoc. (In re Raymond),* 169 B.R. 67, 71 (Bankr.W.D.Wash. 1994) ("The government is not an insurer of the value of education."); *Silliman v. Nebraska Higher Educ. Loan Program (In re Silliman),* 144 B.R. 748, 752 (Bankr.N.D.Ohio 1992).

*In re Hall,* 293 B.R. at 737 (citing *Flores v. U.S. Dep't of Educ. (In re Flores),* 282 B.R. 847, 856 (Bankr.N.D.Ohio 2002)); *see also Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 360 (6th Cir.1994) (relevant good faith factors are: (1) whether the debtor attempts to repay the debt; (2) the length of time after the student loan becomes due that the debtor seeks to discharge the debt; (3) the percentage of the student loan debt in relation to the debtor's total indebtedness; and (4) the debtor's attempts to find suitable employment).

A review of recent decisions of the courts of the Fourth Circuit reveals that in most instances where a court determined a debtor made a good faith effort to repay their student loan, there was a finding that substantial loan payments had been made. *See, e.g., Floyd v. Educ. Credit Mgmt. Corp.,* 54 Fed.Appx. 124, 126 (4th Cir.2002) (unpublished) (where bankruptcy court found the debtor kept in frequent contact with his lenders, arranged for deferrals and forbearance, investigated loan consolidations and workout options and made partial payments for a year, third prong of *Brunner* was satisfied and no error committed); *Vermont Student Assistance Corp. v. Coulson (In re Coulson),* 253 B.R. 174, 179 (W.D.N.C.2000) (good faith found "where debtor has diligently made payments or sought deferments for seven years," notwithstanding "supporting at least 2 (and initially 4) dependent children by herself"); *Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson),* No. 01–30624, 2002 WL 32155401, at *4 (Bankr.E.D.Va. June 25, 2002) (debtor consistently made payments on student loans for twelve years and, after loan consolidation, made 29 payments); *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack),* No. 99–10637, 2000 WL 33710278, at *6 (Bankr. D.S.C. July 3, 2000) ("Debtor has made over twenty payments on her student loan

prior to filing bankruptcy, and she has made various efforts to find a job that would provide more income, but has been unable to find one at the present time."); *Lohr v. Sallie Mae (In re Lohr),* 252 B.R. 84, 89 (Bankr.E.D.Va.2000) ("[T]he debtor made payments when she was financially able, tried to negotiate deferments and forbearance in lieu of bankruptcy when she was not and filed bankruptcy only as a last resort.").

Conversely, where no payments at all have been made by a debtor, courts often have concluded no good faith effort to repay was in evidence. *Tennessee Student Assistance Corp. v. Mort (In re Mort),* 272 B.R. 181, 185 (W.D.Va.2002) ("Although her failure to make payments on the loan does not on its own show lack of good faith, the debtor's refusal to minimize her expenses and maximize her income … preclude a hardship discharge of any portion of the loan."); *Weir v. Paige (In re Weir),* 296 B.R. 710, 718 (Bankr.E.D.Va. 2002) (no good faith shown where "[n]ot only has debtor not made any effort to repay any portion of these loans, but she has repeatedly refused various repayment options that have been offered to her"); *Kapinos v. Graduate Loan Ctr. (In re Kapinos),* 253 B.R. 709, 714 (Bankr. W.D.Va.2000) (no " 'good faith effort to repay the loans' when [the debtor] has affirmatively established that she made no effort to make any payments before seeking discharge"). *But see Reilly v. United Student Aid Funds, Inc.,* 118 B.R. 38, 41 (Bankr.D.Md.1990) ("[T]he debtor's demonstrated inability to tender payments on a student loan which became due five years prior to filing of bankruptcy provides an exception to the rule that payments must be made in order to show good faith."). .

Decisions outside of the jurisdiction of the Fourth Circuit Court of Appeals mir-

ror this same reluctance to find good faith where the debtor has made minimal or no payments on student loans. *See, e.g., Fuller v. U.S. Dep't of Educ. (In re Fuller)*, 296 B.R. 813, 819 (Bankr.N.D.Cal.2003) (no good faith shown where debtor made no payments on his Department of Education loans); *Thoms v. Educ. Credit Mgmt. Corp. (In re Thoms)*, 257 B.R. 144, 150 (Bankr.S.D.N.Y.2001) (good faith not shown where the "[d]ebtor only made seven payments totaling $683.69 from 1991 to 1993 and has made no payments at all since receiving her master's degree"); *Ledbetter v. U.S. Dep't of Educ. (In re Ledbetter)*, 254 B.R. 714, 717 (Bankr. S.D.Ohio 2000) (good faith not shown "when debtor made only three payments on two student loans that represented the only scheduled debt in [the] case"); *Douglass v. Great Lakes Higher Educ. Serv'g Corp. (In re Douglass)*, 237 B.R. 652, 656–57 (Bankr.N.D.Ohio 1999) (good faith effort to repay not shown where debtor made no payments on loans that represented 92% of her indebtedness); *Mitchell v. U.S. Dep't of Educ. (In re Mitchell)*, 210 B.R. 105, 109 (Bankr.N.D.Ohio 1996) (good faith effort to repay not shown when debtor only made $300.00 payment on $8,000.00 student loan debt that was only scheduled debt in the case); *Cobb v. Univ. of Toledo (In re Cobb)*, 188 B.R. 22, 24 (Bankr. N.D.Ohio 1995) (good faith not shown where debtor made only two payments on student loans representing over 50% of scheduled debt); *Garrett v. New Hampshire Higher Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 364 (Bankr. D.N.H.1995) (good faith not shown where "[t]he record is devoid of any payment made by [the debtor] on these loans or even any attempt to enter into a repayment schedule with [the lenders]"); *Daugherty v. First Tennessee Bank (In re Daugherty)*, 175 B.R. 953, 958–60 (Bankr. E.D.Tenn.1994) (good faith effort to repay

not shown where debtor made no effort to commence payments on student loans amounting to 47% of total unsecured debt); *Raymond v. Northwest Educ. Loan Ass'n (In re Raymond)*, 169 B.R. 67, 70 (Bankr. W.D.Wash.1994) (good faith not shown where the debtor made no payments on his student loans for at least half the time he was employed); *Silliman v. Nebraska Higher Educ. Loan Program (In re Silliman)*, 144 B.R. 748, 751 (Bankr.N.D.Ohio 1992) (good faith not shown where "[d]ebtor deferred the loan repayment once, but made no payments or even contacted the creditor in an attempt to reschedule the payments").

However, failure to make payments is not bad faith *per se.* Courts have also recognized that a truly impoverished debtor cannot be considered acting in bad faith for not paying on his loans if he clearly does not have the money to do so. *See Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922, 929 (Bankr. N.D.Ohio 1995) ("Given the magnitude of the student loan debt, the paucity of [the debtor's] income, and the apparent hopelessness for future improvement of his situation, the fact he made no payments on his student loans until after he had consulted an experienced bankruptcy attorney is not an indication of bad faith."). As another court discussed, the good faith inquiry "seems counterintuitive when applied ... where the Debtor lives in abject poverty." *Mosley v. Gen. Revenue Corp. (In re Mosley)*, 330 B.R. 832, 847 (Bankr. N.D.Ga.2005); *see also Id.* (quoting *Rutherford v. William D. Ford Direct Loan Program (In re Rutherford)*, 317 B.R. 865, 880 (Bankr.N.D.Ala.2004) ("Is being poor bad faith? Surely not. If [the debtor] does not have enough money to pay the student loan, [he] cannot be considered to be acting in bad faith if [he] does not pay the loan.")). This Court has also noted

that a good faith effort only requires "the debtor to have made payments when he or she was in a position to make such payments." *Wilson v. Educ. Credit Mgmt. Corp. v. Wilson (In re Wilson)*, No. 01–30624, 2002 WL 32155401, at *4 (Bankr. E.D.Va. June 25, 2002) (quoting *Lohr v. Sallie Mae (In re Lohr)*, 252 B.R. 84, 89 (Bankr.E.D.Va.2000)).

■ Burton argued while he has not always made payments that he did the best he could and that he has demonstrated a good faith effort to repay on his loans. In contrast, ECMC argued that Burton has not demonstrated a good faith effort to repay his loans, and points to Burton's lack of payment history, failure to maximize his income, and failure to consider repayment options as evidence of Burton's lack of good faith.

Burton testified that he has made voluntary payments on his student loans; however, he also admitted he has not made any voluntary payments since 1992. Further, Burton testified that after making a couple of payments in the late 1980's or early 1990's, he returned to school and secured a forbearance on his student loan payments.[44] Burton additionally testified that he previously had records of these payments but that he no longer has this documentation.[45] He testified that at some point while he was living in Virginia, he rented a house but that due to being hospitalized, he fell into arrears on rent,

was evicted, and his belongings in storage were sold.[46]

Burton also testified that he attempted to consolidate his loans by contacting Sallie Mae in the late 1980's or early 1990's. He further testified that prior to leaving school he had his loans consolidated through Sallie Mae and was given a reduced monthly payment amount. Additionally, Burton argues that payments have been made on his student loans through his tax intercepts. Burton testified that he has not received an income tax refund since 1990 because those refunds were intercepted to pay his student loans and child support arrears.

■ While the Court agrees with the sentiment that there is no requirement that a debtor be forced to live at or below the poverty level in order to successfully discharge his student loans, Burton has not convinced the Court that he has made a good faith effort to make payments on his student loans. The evidence before the Court indicates that Burton has made at best very limited payments on his student loans. There is little doubt from the record that Burton has had periods of time where he was incapable of staying continuously employed, and thus, he has had periods of time where he was incapable of making payments on his student loans. However, there have also been times where Burton was employed, and there was no evidence presented at trial regarding whether he made loan payments dur-

---

**44.** Burton did not testify to the exact date of the forbearance, the year in which he returned to school, or whether he made payments after the forbearance period ended; therefore, this Court has only a partial picture of Burton's payment history.

**45.** While Burton stated he previously had documents relating to payments on his student loans generally, he also admitted in his answer to Defendant's Request for Admissions to not having any documents evidencing

that he made a good faith effort to repay on Defendant's student loans. Def. Exh. F., Request No. 20.

**46.** In Defendant's Request for Admissions, ECMC requested all documents relating to any payments that the debtor made on the student loans. Burton's response was "SEE ATTACHED," but there were no attachments presented to the Court. Def. Exh. F., Request No. 8.

ing those time periods. Because there was no documented evidence presented at trial, and Burton's testimony was difficult to interpret at times, this Court is unable to determine, assuming payments were made, the specific dates or times when any voluntary payments were made. Thus, this Court cannot compare Burton's employment record with his payment record to determine if Burton made loan payments during his periods of relatively stable employment. For example, Burton testified that he worked at Eastman Kodak for a total period of four years; however, this Court is unable to determine if any loan payments, or how many loan payments, were made during that period of seemingly stable employment. Therefore, while this Court is convinced that there were periods where Burton legitimately could not pay on his loans, given the lack of evidence presented to the Court surrounding the time period when voluntary loan payments were allegedly made, this Court is unable to conclusively determine if Burton actually made payments when he was in a position to do so. *In re Wilson*, 2002 WL 32155401, at *4 (quoting *In re Lohr*, 252 B.R. at 89) (A good faith effort requires "the debtor to have made payments when he or she was in a position to make such payments.").

Some courts, in determining good faith, have additionally looked to whether a student loan debtor has attempted to negotiate a repayment plan as an important indicia of good faith. The Fourth Circuit Court of Appeals has recognized the significance of this consideration:

[t]he debtor's effort to seek out loan consolidation options that make the debt less onerous is an important component of the good-faith inquiry. Although not always dispositive, it illustrates that the debtor takes her loan obligations seriously, and is doing her utmost to repay

them despite her unfortunate circumstances.

*In re Frushour*, 433 F.3d at 402–403 (citing *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir.2005); *Tirch v. Pennsylvania Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 682–83 (6th Cir.2005)).

▇▇▇▇ While courts look to the debtors willingness to entertain such income-contingent repayment plans as an indicia of good faith, it is not *per se* lack of good faith to fail to consider such a plan. *See Cota v. U.S. Dep't of Educ. (In re Cota)*, 298 B.R. 408, 420 (Bankr.D.Ariz.2003) ("The court agrees that the good faith requirement of *Brunner* requires that the court consider [the debtor's] conduct in failing to explore alternatives, such as the ICR. However, the failure to explore such programs, especially if the programs offer no effective relief, is not per se an indication of lack of good faith."); *see also Pennsylvania Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 (9th Cir. BAP 2002) (quoting *U.S. Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (C.D.Cal.2000) ("Good faith is also measured by a debtor's effort—or lack thereof—to negotiate a repayment plan.")). Even after filing an adversary proceeding to discharge a student loan, "[a] debtor's obligation to make 'good faith' efforts to repay [her] education loans is not extinguished," and where a debtor first learns about the repayment programs during the trial of the adversary, a court considers whether any discussions concerning such options takes place. *Id.* (quoting *In re Wallace*, 259 B.R. at 185). However, these programs are "no silver bullet," and if the creditors fail to advise particular debtors of the programs and assist the debtors with pursuing them, failure to consider these alternatives does not indicate a lack of good faith. *In re Cota,*

298 B.R. at 421 (quoting *Cheney v. Educ. Credit Mgmt. Corp. (In re Cheney)*, 280 B.R. 648, 666 (N.D.Iowa 2002)).

The United States Department of Education offers a number of repayment options for student loans. In fact, counsel for ECMC sent counsel for Burton a letter dated August 1, 2005, encouraging Burton to consider the federal government repayment plan and described how loan payments are determined under such ·a program. Additionally, at trial, ECMC argued that Burton has not attempted to negotiate a payment plan nor has he attempted to take advantage of a federal government plan, such as the William D. Ford Direct Loan repayment program ("Ford Program"), to bolster their position that Burton has not established that he has acted in good faith. Further, ECMC argued that under the Ford Program there are four different options, one of them an income-contingent repayment option, which if Burton elected would enable his current payment to be zero since the payment is calculated based on income.

Burton testified that he had heard of the Ford Program but that he had not seen the letter counsel for ECMC sent his attorney regarding options under such a plan. Further, he testified that he was aware through ECMC of the Ford Program, and that the Ford Program offered repayment plans. Additionally, Burton testified that, while he does not recall if he discussed those exact repayment plans with his attorney, his attorney did discuss with him that there were options available besides bankruptcy to work out his payment problems. When questioned about the Income–Contingent Repayment Plan,

Burton stated, "I haven't had time to look at this, and when you say, you know, my payments would be zero, it kind of smacks are you getting something for nothing, and I don't believe in that, something for free." Tr. at 32. Burton went on to state that he did not see himself ever obtaining a job that would allow him to pay off his loans, and therefore the plan did not seem to be a· good way to resolve the situation.[47]

Burton does not appear to have given any serious consideration to the repayment options under the Ford Program, nor did he appear during his testimony to fully understand how the Ford Program works. The Ford Program is offered by the United States Department of Education and allows the borrower to consolidate their student loans while retaining eligibility for deferments and forbearances. *See generally* 34 C.F.R. § 685 (2005); U.S. Department of Education, Information for Financial Aid Professionals (IFAP) Library, www.ifap.ed.gov; and U.S. Department of Education, William D. Ford Federal Direct Loan Program, www.ed.gov/programs/wdffdl/index.html. Under the Ford Program, the borrower may pay off the consolidated loan over a period of up to twenty-five years through a variety of repayment options, including those based on household income, circumstance, and size of family. Included among these repayment options, the borrower may choose the Income Contingent Repayment Plan, in which case repayment is based upon income, family size, loan amount, and interest rate. *See generally* 34 C.F.R. § 685 (2005); *see also Thompson v. New Mexico Student Loan Guarantee Corp. (In re*

47. During the trial, when counsel for ECMC questioned Burton about these repayment plans, the Court offered to recess to allow the parties to discuss repayment options. However, counsel for Burton stated that while he was "always willing to talk ... [that] it seems to be beating a dead horse." Tr. at 33. Further, he stated that he did not think Burton would ever make enough money to pay off his loans, especially in light of his child support arrears.

*Thompson)*, 329 B.R. 145, 181 n. 43 (Bankr.E.D.Va.2005) (citing *In re Cota*, 298 B.R. at 414 n. 7, at 420–21).

As previously stated, it does not appear that Burton gave any serious consideration to the Ford Program. Additionally, when questioned about the Income–Contingent Repayment Plan, Burton stated, "I haven't had time to look at this . . . ." Tr. at 32. Burton, besides noting that he did not think participating in the program would ever be feasible for him, did not elaborate on why he had not looked into the Ford Program prior to trial nor did his counsel think recessing the trial to discuss it would be a worthwhile venture.

When a debtor is supplied with notice and information of a potentially viable student loan repayment option, the debtor's failure to look into or otherwise consider this option may contribute to a finding of bad faith. The consequences of inadequate explanation of a debtor's failure to seriously consider loan consolidation was succinctly set forth in *In re Frushour*:

> [The debtor's] only reasons for refusing that option, however, were it was not suited for her and she wanted a fresh start. It is hard to see why these reasons are not simple shorthand for her lack of interest in repaying her debt . . . . [The debtor] has provided insufficient justifications for refusing to take a simple step that would have allowed her to fulfill her commitments in a manageable way. [The debtor] thus failed to satisfy the third *Brunner* factor of manifest good-faith effort to repay her loans.

*In re Frushour*, 433 F.3d at 403–404. *See also Tirch v. Pennsylvania Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 682 (6th Cir.2005) (debtor's decision to not take advantage of the Income Contingent Repayment Plan, "while not a *per se* indication of a lack of good faith . . . is probative of her intent to repay her

loans"); *McMullin v. U.S. Dep't of Educ. (In re McMullin)*, 316 B.R. 70, 80 (Bankr. E.D.La.2004) (where no evidence was presented that the debtor was actually informed of repayment options, the debtor's failure to actively seek out alternative payment plans did not bar a finding of good faith); *Carlson v. UNIPAC Student Loan (In re Carlson)*, 273 B.R. 481, 486 (Bankr. D.S.C.2001) (court did not find bad faith on behalf of the student loan debtor who did not consider the Income Contingent Repayment Program in part because "there [was] no proof that Debtor was advised of such option in time for her to properly respond to it or consider it as an option."); *Douglass v. Great Lakes Higher Educ. Servicing Corp. (In re Douglass)*, 237 B.R. 652, 657 (Bankr.N.D.Ohio 1999) (failure to accept an offer from the government's Income Contingent Repayment Program may be "tantamount to an abuse of the bankruptcy process").

 Even if the Ford Program does not provide a viable alternative in a particular case, the availability and viability of these repayment options should be considered as a potential alternative before attempting to discharge student loans. *In re Tirch*, 409 F.3d at 682; *see also In re Cota*, 298 B.R. at 420. While failure to consider such an alternative is not a *per se* indicator of bad faith on its own, it must be considered in conjunction with other evidence and weighs against a possible finding of dischargeability. *See Ritchie v. Northwest Educ. Loan Ass'n (In re Ritchie)*, 254 B.R. 913, 923 (Bankr.D.Idaho 2000) (ability to pay under an income contingent repayment program may render a student loan obligation nondischargeable).

 Burton's failure to consider other repayment options, while not a *per se* indicator of bad faith, when combined with the lack of evidence regarding his repayment of his loans, leads the Court to conclude

that Burton has not made a good faith effort to repay his student loans. *See In re Tirch*, 409 F.3d at 683 ("Because [the debtor] declined to take advantage of an [income contingent repayment program] that would have been advantageous, she failed to sustain the heavy burden of proving that she made a good faith effort to repay her loans."). Burton testified that he did not think he could ever feasibly pay on his loans and therefore he did not view the Ford Program as a viable option; however, ECMC argued that if Burton's income never increased, then under the Ford Program, Burton would never be required to make a payment.[48] While this Court does not think Burton's failure to agree to enter the Ford Program is bad faith *per se*, this Court is not convinced that Burton thoroughly considered and looked into his options prior to reaching the conclusion that the Ford Program was not a viable option for him. Therefore, this Court is not convinced that Burton considered any repayment programs thoroughly enough to warrant the conclusion that he sustained his burden of proving a good faith effort to repay his loans.

Some courts have also examined a debtor's willingness to seek a deferment as an indicia of good faith. *See Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 397 (2d Cir.1987) (finding that the debtor lacked good faith in attempting to discharge debt because she had failed to seek a deferment of her loan); *U.S. Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (C.D.Cal.2000) (the debtor's "lack of diligence in pursuing repayment options, despite its repeated overtures, militates strongly against a finding that [the debtor] continued his good faith efforts to repay the loans."); *Healey v. Mass. Higher Educ. (In re Healey)*, 161 B.R. 389, 397 (E.D.Mich.1993) (finding the debtor's attempt to discharge debt without first seeking to negotiate a payment arrangement with the lender evinced bad faith); *McMullin v. U.S. Dep't of Educ. (In re McMullin)*, 316 B.R. 70, 79 (Bankr. E.D.La.2004) (finding the "debtor's requests for a deferment or forbearance constitutes another indication of the debtor's good faith"); *Sands v. United Student Aid Funds, Inc. (In re Sands)*, 166 B.R. 299, 311 (Bankr.W.D.Mich.1994) ("In determin-

---

**48.** While Burton might never have to make a payment in the 25–year period, there is a potential tax liability on any amount of the loan forgiven after 25 years. The Income Contingent Repayment Plan provides, "[i]f a borrower has not repaid a loan in full at the end of the 25–year repayment period ... the Secretary cancels the unpaid portion of the loan." 34 C.F.R. § 685 (2005). While the potential for tax implications were not raised by either party, at least one debtor has argued that the "Income Contingent Repayment Plan offers only false hope because ... any forgiveness of the remaining debt in 25 years will be a taxable event, imposing a high tax liability." *Educ. Credit Mgmt. Corp. v. Stanley (In re Stanley)*, 300 B.R. 813, 818 n. 8 (N.D.Fla. 2003). However, the court in that case found that "[f]orecasting such a tax liability under whatever tax laws will be in effect in 25 years would be shear speculation. Forecasting the effect any such liability would have on [the

debtor's] actual standard of living at that time would be even more speculative." *Id.*

Therefore, while some courts, as noted in *In re Stanley*, have "referred to this potential tax liability as a factor in allowing discharge of student debts," this Court concurs that such an analysis would be speculative. *Id.* (citing *Pennsylvania Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 n. 2 (9th Cir. BAP 2002); *Gregoryk v. United States (In re Gregoryk)*, No. 00–31050, 2001 WL 1891469 (Bankr.D.N.D. March 30, 2001) (unpublished opinion); *Thomsen v. Dep't of Educ. (In re Thomsen)*, 234 B.R. 506, 506 (Bankr.D.Mont.1999)). Further, since Burton did not refer to this potential tax liability as having an impact on his consideration, or lack thereof, of such repayment plans, or as having any effect on his rationale for finding such repayment plans unfeasible, this Court cannot presume that the potential tax implications had any role in his rationale.

ing the Debtor's good faith, the court must not only examine the Debtor's payments towards his student loans, but also his efforts to negotiate deferments with the applicable student loan agency."); *see also Shankwiler v. Nat'l Student Loan Mktg. (In re Shankwiler)*, 208 B.R. 701, 708 (Bankr.C.D.Cal.1997) (finding good faith because debtor requested a forbearance for six years and minimized expenses). Burton testified that at some point in his educational history he took a break from school, made a few payments on his educational loans, and then returned to school and requested a forbearance. Further, he testified that he contacted Sallie Mae about consolidating his loans and that prior to leaving school he did in fact consolidate his loans. Burton did not testify as to whether he has sought deferment or forbearance on his loans in the more recent years. Again, while the lack of evidence presented regarding Burton's willingness or ability to seek deferment is not necessarily an indicator of bad faith, this Court simply was not provided with enough evidence regarding Burton's attempts to defer his loans or to seek forbearance to determine if he met his burden of good faith.

Burton's counsel argued that Burton has met his burden of showing good faith given his limited resources, living situation and medical disability. This Court recognizes that Burton has had a difficult history, and the Court finds his testimony regarding his difficult job and living situations credible. However, as this Court has previously discussed, "[i]t would be inappropriate for this Court to endorse a justification on behalf of the debtor for [his] lack of good faith in repaying [his] student loans, based solely on [his] psychological state, with no medical or any other substantive evidence . . . ." *Thompson v. New Mexico Student Loan Guarantee Corp. (In re Thompson)*, 329 B.R. 145, 188 (Bankr.

E.D.Va.2005). This Court will not rehash its conclusion on the necessity for corroborating evidence which was discussed earlier during the Court's discussion of the second prong of the *Brunner* test; however, this Court will reiterate its view that the impact Burton's mental illness may have had on his ability to make student loan payments is indeterminable without evidence to corroborate his testimony.

Therefore, in evaluating whether or not Burton met his burden of proving good faith, rather than weighing Burton's mental condition in its analysis of good faith, this Court places great weight on his history of making payments or lack thereof, and also on his lack of consideration of alternative options to bankruptcy. Without corroborating evidence, the evidentiary record before the Court simply reflects that Burton has encountered difficult circumstances regarding his employment, child support arrears, and meager resources. While Burton's testimony regarding his employment history reflects that there were times when his failure to pay on his loans may not have been an indication of bad faith, he supplied the Court with no explanation as to whether he made payments during his periods of stable employment. Further, Burton provided no explanation as to whether or not he attempted to seek a deferment or forbearance during the most recent years. Additionally, while this Court recognizes the Ford Program is "no silver bullet," and refusal to participate in such a program is not *per se* bad faith, this Court was not presented with any evidence regarding Burton's thorough consideration of such a program before concluding it was not a feasible option. The totality of the circumstances leads this Court to conclude that Burton failed to meet his burden of persuading the Court that he meets the good faith requirement. Thus, because *Brun-*

*ner* requires the debtor to meet each of three prongs independently, Burton's failure to persuade the Court that he made a good faith effort to repay on his student loans requires that his student loans are non-dischargeable.

## V.

### SUMMARY

The Court has great sympathy for Burton given his obvious struggles in the past. His efforts to overcome alcohol and drug addiction are commendable, as is his willingness to perform volunteer work helping others with similar struggles. This Court, however, is bound by the evidence presented in the record and cannot decide cases based on sympathy or emotions. The Court was not presented with any evidence indicating whether Burton considered any alternative repayment options for his student loans, nor was the Court presented with any corroborating evidence regarding Burton's medical condition, future prognosis, or payment history on his student loans. Thus, failing to meet his burden of proof under the test set forth in *Brunner*, the Court finds that Burton's student loans must be declared non-dischargeable pursuant to § 523(a)(8).

A separate order will issue.